

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 5, 2021

**BY ECF**
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Sanchez*, 21 Cr. 269 (CM)

Dear Judge McMahon:

    The Government respectfully submits this letter in opposition to the bail application of defendant Malik Sanchez, a/k/a "Smooth Sanchez" ("Sanchez" or the "defendant") in the above-captioned case. The Court should deny the defendant's application.

    As described in more detail below, on February 13, 2021, the defendant conveyed a bomb hoax threat outside of a Manhattan restaurant, causing diners in the restaurant's outdoor enclosed seating area to flee in terror. The bomb hoax was part of a disturbing pattern for this defendant, who in recent months has posted videos of himself on his online accounts in which he harasses and, in multiple instances, pepper sprays innocent victims. In many of these videos, Sanchez self-identifies as an "Incel" or "Involuntary Celibate," proclaiming support for the extremist, largely online group founded on the belief that society unjustly denies them sexual or romantic attention to which they are entitled, and which has been responsible for carrying out horrific acts of violence in recent years. The defendant can be seen in his videos, for example, yelling at women that it is their fault he is a virgin and that the victims of Elliot Rodger – an Incel who murdered six people and injured 14 others in California in 2014 – "deserved to be run over and hit by a truck"[1] and "slaughtered." Ex. F.[2] The defendant also repeatedly praises Rodger, stating, for example, that Sanchez "pull[s] out the Glocks and . . . bust[s] that shit" for Rodger. Ex. H, 0:40-0:51. Particularly concerning is that, in just the six months prior to the defendant's arrest on the instant charge, the defendant has maced at least five victims on video. Exs. A, B, D, E, and H; *see also* Ex. C (showing Sanchez spraying mace off the Queensboro Bridge). When law enforcement officers conducted a search of the defendant's premises subsequent to his arrest on the instant charge, they discovered, among other things, five magazines that fit a Glock firearm. The defendant been has arrested on approximately seven different occasions – five times within just the six months prior to his most recent arrest. Despite repeated arrests, however, the defendant has not been deterred. He is a

---

[1] Descriptions and quotations of videos herein are set forth in substance and in part, are based on review of those videos, and are subject to revision upon the preparation of transcriptions.

[2] The Government is providing the Court and defense counsel with disks containing the video excerpts referenced herein as Exhibits A through I as well as the transcript of the prior detention hearing, referenced herein as Exhibit J.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 2

menace to the community, responsible for repeated assaults with pepper spray on the New York City streets, with a demonstrated disregard for the criminal justice system and judicial authority, and he should be detained.

In approximately February 2021, the Federal Bureau of Investigation's New York-based Joint Terrorism Task Force ("JTTF") began investigating Sanchez in connection with the conduct described herein. On April 12, 2021, Magistrate Judge Wang authorized a Complaint charging the defendant with one count of false information and hoaxes, in violation of Title 18, United States Code, Sections 1038(a)(1) and 2, premised on violations of Title 18, United States Code, Sections 844(i) (malicious use of explosive materials) and 2332a(a) (use or threatened use of a weapon of mass destruction), in connection with the February 13, 2021 bomb hoax threat. On April 14, Sanchez was arrested on the basis of the Complaint and, after a detention hearing before Judge Wang, was ordered detained. On April 22, 2021, a Grand Jury sitting in the Southern District of New York returned a one-count Indictment containing the same charge contained in the Complaint. On April 29, 2021, the defendant filed the instant motion to appeal Judge Wang's detention order.

Contrary to the defendant's assertion (*see* Def. Ltr., Dkt. 11), a detention hearing was warranted on multiple independent grounds. *See* 18 U.S.C. §§ 3142(f)(2)(A) (case involves serious risk of non-appearance), 3142(f)(2)(B) (case involves serious risk that defendant will threaten, injure, or intimidate witnesses), 3142(f)(1)(A) (case involves offense listed in 18 U.S.C. § 2332b(g)(5)(B)). And Judge Wang was manifestly correct in finding that the defendant should be detained based on both danger to the community and risk of flight. The Government submits that for the reasons set forth by Judge Wang during the initial bail hearing as well as the additional reasons proffered herein, there is no combination of conditions that can protect the safety of the community or reasonably assure the defendant's continued appearance in this case were he to be released. Accordingly, the Government respectfully requests that the Court order that the defendant continue to be detained pending trial.[3]

## BACKGROUND

### I.     The Bomb Hoax Threat

In the afternoon of February 13, 2021, Sanchez conveyed a bomb hoax threat in the enclosed outdoor seating area of a restaurant in the Flatiron district of Manhattan. Compl. ¶ 6. Sanchez recorded and posted a video of the incident to his YouTube account. *See* Ex. G; Compl. ¶ 6(a). In the video, Sanchez walked up to two women inside the seating area while saying, "Let's enhance their meal." Compl. ¶¶ 6(a)(i)-(ii). He then loudly stated the following:

---

[3] Because this letter includes information about the defendant's ▮▮▮▮▮▮▮▮▮▮ the Government respectfully seeks the Court's permission to redact such information herein. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Government is filing a redacted version of this letter on ECF, and providing the Court and defense counsel with an unredacted copy.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 3

> Allahu Akbar. Allahu Akbar. Bomb detonation in two, in two minutes. I take you with me and I kill all you. I kill all you right now. And I kill all you for Allah. Fuck, fuck that shit. I'm gonna Allah. I'm gonna do it. I'm gonna fucking do it for Allah. I'm gonna do it, for, Allah, Allah, Allahu Akbar, Come on. I do it, bomb now, bomb now.

Ex. G; Compl. ¶ 6(a)(iii).

Upon witnessing Sanchez's bomb hoax, approximately four people inside the seating area ran away. Ex. G; Compl. ¶ 6(a)(iv). The two women whom Sanchez stood beside gathered their belongings and went into the restaurant. *Id.*; *id.* After fleeing the scene with another individual ("CC-1"), Sanchez stated, "Yo, all of them scattered," laughed, and then said, "Holy shit. Holy shit boys. That was fucking five stars. That was five stars. Holy shit, huh?" Ex. G; Compl. ¶ 6(a)(v). A short time later, in discussing the bomb hoax, CC-1 stated, "Listen, you fucking people that run this world, you wanna troll us, we'll troll you back," to which Sanchez responded, "We're gonna fucking troll you" and "We do it. We do that fucking shit. We do that fucking shit." Ex. G.

One of the individuals who ran away from Sanchez ("Victim-1") called 9-1-1 after the incident, and two New York City Police Department ("NYPD") officers responded to the scene. In subsequent interviews with JTTF, Victim-1 and her friend ("Victim-2") explained, in substance and in part, that they had run for their lives, taking shelter in a different restaurant on a side street half a block away. Both said, in substance and in part, that they had believed that Sanchez was a terrorist and was about to murder them.[4]

## II.  **The Defendant**

### a. *The Defendant's Support for Incel's Violent Ideology*

The defendant, who goes by the name "Smooth Sanchez" online, posts videos to social media and other Internet accounts – which appear to be livestreamed[5] – in which he walks in public areas, typically in Manhattan, and harasses, and, in some instances, harms innocent strangers going about their daily lives. Compl. ¶ 5(a). The defendant's online followers publicly "donate" funds to Sanchez in real-time, using an online video service, to reward or encourage his conduct.

---

[4] Victim-1 and Victim-2 further told law enforcement, in substance and in part, that when they returned to their table after fleeing, they spoke with other witnesses to the bomb hoax threat. The women who had walked inside the restaurant reported hearing CC-1 state, in substance and in part, it was for "a video." Another woman who, like Victim-1 and Victim-2, had run away, told Victim-1 and Victim-2, in substance and in part, that she also had believed the bomb threat was real.

[5] Sanchez refers to himself as an "In Real Life" or "IRL" streamer. He appears to "livestream" or "stream" content, meaning that he simultaneously records and broadcasts the videos online.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 4

In Sanchez's videos, he consistently self-identifies as an "Incel" and expresses support for "Incel" ideology. *Id.* ¶ 3. The term "Incel" (short for "Involuntary Celibate") refers to members of a group founded on the belief that society unjustly denies them sexual or romantic attention, to which they believe they are entitled. *Id.* ¶ 4. The Incel community is primarily an online community composed of individuals, mostly men, who blame political or social movements like feminism for empowering others to deny them romantic or sexual attention. *Id.* Incels have conducted at least five lethal attacks in the United States and Canada since 2014, resulting in 28 deaths. *Id.* For example, in May 2014, Elliot Rodger, whom Incels generally regard as the group's unofficial founder – and who Sanchez appears to lionize – attacked a sorority house and pedestrians in Santa Barbara, California, with a knife, firearms (including a Glock semi-automatic pistol), and a vehicle, killing six and injuring 14 victims. *Id.* Prior to the attack, Rodger posted an online video titled "Elliot Rodger's Retribution," and shared a written manifesto describing his grievance towards women and detailing a plan for their mass imprisonment and murder. *Id.*

Among the many examples of Sanchez's displays of his support for extremist and violent "Incel" ideology are the following:

- On or about February 7, 2021, Sanchez followed two women down a street in Manhattan and yelled at them after they refused to give them their phone numbers, among other things, "Fuck you, you bitch. It's 'cause of you, it's 'cause of you that I'm a virgin - I have Incel rage." Ex. F; *Id.* ¶ 5(b). Sanchez also repeated multiple times that Elliot Rodger was a "good guy," Rodger's victims "deserved to be run over and hit by a truck" and "slaughtered," and Rodger "should have blown their brains out a long time ago." *Id.*

- On or about March 20, 2021, Sanchez harassed numerous people seated in and around an outdoor seating area, mimicked pointing a gun with his fingers on one hand and stated, among other things, "Elliot fucking Rodgers, baby. I pull out the Glocks, baby. I, I, I do it all day. I really pull out the Glocks and I - I bust that shit." Ex. H, 0:40-0:51; *Id.* ¶ 5(c).

- On or about March 24, 2021, Sanchez spoke directly to his followers, stating, among other things, "I am an Incel. I'm an Incel. But, I guess streaming kind of helps me therapeutically in a sense, that it keeps me out of, like, my Incel, the mindset." Ex. I, 03:11-03:30.

   b. *The Defendant's Criminal History*

As described in more detail below, the defendant has three pending cases in New York: (i) in connection with spraying pepper spray at a male victim as described in Section II.c below, for possession of a weapon, assault, harassment, and unlawful possession of noxious material (December 2020); (ii) for possessing a weapon, a taser, when the defendant was arrested for the pepper spray incident above (December 2020);[6] and (iii) in connection with spraying pepper spray at a different male victim as described in Section II.c below, for possession of a weapon, assault,

---

[6] The Government understands that the December 2020 cases may be consolidated.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 5

harassment, criminal possession of a weapon (March 2021). The defendant was released on his own recognizance each time, as a result of the current New York State bail laws. The Government understands from the New York County District Attorney's Office that the defendant did not appear at a scheduled virtual court date on or about April 8, 2021 for these three cases.

Two of the defendant's recent cases have resolved. First, the defendant pled guilty to a disorderly conduct violation in connection with climbing and spraying pepper spray off of the Queensboro Bridge on or about October 22, 2020 as described in Section II.c below. The defendant received a conditional discharge on or about January 21, 2021, which included a requirement that he stay arrest-free for six months – a requirement he has flagrantly disregarded, as he has been arrested multiple times since then, including on the charge in this case. Second, the defendant's case in connection with pepper spraying a woman on or about October 20, 2020, as described in Section II.c below, was adjourned in contemplation of dismissal ("ACD") on or about January 21, 2021. In connection with the ACD, the defendant was required to attend three sessions of a virtual program and similarly comply with the requirement that he not be re-arrested for six months.



The defendant been has arrested on approximately seven different occasions, including the most recent arrest in this case.[7]

---

[7] The defendant was arrested on or about ███████████████████████████████ on or about October 22, 2020 for climbing the Queensboro Bridge that day; on or about October 23, 2020 for spraying pepper spray at a female victim on or about October 20, 2020; on or about December 16, 2020 for spraying pepper spray at a male victim on or about December 6, 2020; on or about March 20, 2021 for spraying pepper spray at a male victim that day; and on or about April 14, 2021, in the instant case.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 6

### c. The Pepper Spray Incidents

The defendant has been captured on video spraying pepper spray on at least five victims in just the six months prior to his arrest on the instant charge:

- On or about October 20, 2020, the defendant pepper sprayed an African-American woman in the Flatiron neighborhood of Manhattan after the victim yelled at Sanchez, "I will mace you," "get that phone outta my face," and "enough is enough of this race shit you're promoting out here."[8] Ex. B. After spraying pepper spray at the victim, the defendant taunted the victim, yelling, "Congratulations. You just got maced" and "Call 911. Look at you. You just got owned, you retard. You're a retard. You slapped my phone, I'm just protecting my property. You fucking retard. Oh, it burns, right? Oh it burns? Yeah, pretty sure it does burn." Ex. B, 01:49-2:01. As described above, the defendant was arrested and the case was adjourned in contemplation of dismissal. The victim has a temporary protection order against the defendant.

- On or about October 12, 2020, the defendant sprayed pepper spray on a male victim outside of a doughnut shop, after Sanchez had yelled at an employee of the doughnut shop and the victim, another customer waiting in line, confronted Sanchez. Ex. A. It appears that Sanchez was not arrested for this incident.

- On or about October 22, 2020, the defendant climbed support beams on the Queensboro Bridge, approximately 80 feet above the pedestrian path. While on the support beam, the defendant stated, "so I got content spray," "hold on, let's see if it falls on anyone below" and then sprayed pepper spray toward individuals on the pedestrian path below. Ex. C. The defendant then said, "oh shit, oh shit, somebody got maced down there." *Id.* Several NYPD officers ascended the support beams, jeopardizing their own safety, in order to remove Sanchez from the bridge. As described above, the defendant was arrested and pled guilty to a disorderly conduct violation.

- On or about November 21, 2020, the defendant sprayed pepper spray at a male employee of a pastry shop after the defendant harassed the employee and others for several minutes. Ex. D. It appears that Sanchez was not arrested for this incident.

- On or about December 6, 2020, the defendant sprayed pepper spray in a male victim's face in Flatiron. The defendant walked up to the victim while filming and asked, "What is Santa getting you this, this uh Christmas?" Ex. E. When the victim responded, "Getting you away from me," the defendant said, "Why do you sound like a faggot? Are you Jewish? Are you Jewish? What's wrong with you?" *Id.* The defendant then walked up to Sanchez, who sprayed pepper spray in the victim's face. The defendant yelled at the victim and taunted him repeatedly, stating, "Your

---

[8] The video appears to depict the continuation of preceding interactions between the defendant and the victim, which may provide context for the victim's statements, which are not shown in the video.

mother should have aborted you, fuck you." *Id.* Sanchez then began running and talking about how the victim was calling the police, stating, "I ain't getting locked up today." *Id.* NYPD reports reflect that when the defendant was arrested, as discussed above, on or about December 16, 2020 as a result of this incident, he had pepper spray and a taser in his pocket. The case is pending. The victim has a temporary protection order against the defendant.

- On or about March 20, 2021 the defendant harassed numerous people in and around an outdoor seating area on the street in lower Manhattan, while at certain points mimicking pointing a gun with his fingers on one hand and talking about "Glocks" and glorifying Elliot Rodger's killing spree. Ex. H, 0:40-0:51. The defendant sprayed pepper spray on a passerby who attempted to get the defendant to stop. *Id.*, 3:13-5:14. As described above, the defendant was arrested and the case is pending. The victim and his wife have a temporary protection order against the defendant.

### III. Procedural History

On April 12, 2021, Judge Wang authorized a Complaint charging the defendant with one count of false information and hoaxes, in violation of Title 18, United States Code, Sections 1038(a)(1) and 2, premised on violations of Title 18, United States Code, Sections 844(i) (malicious use of explosive materials) and 2332a(a) (use or threatened use of a weapon of mass destruction), in connection with the February 13, 2021 bomb hoax threat.

On April 14, 2021, Sanchez was arrested based on the Complaint and JTTF searched his apartment, pursuant to a search warrant issued by Judge Wang. In the search, law enforcement discovered, among other things, five magazines that fit a Glock firearm; an air soft gun; small rubber balls, possibly for the air soft gun; a paintball gun; paintball pellets; three canisters of pepper spray; a "practice only" spray canister; two pocket knives; as well as handwritten notes describing what appear to be ideas for live-streamed videos, including items like "dive and scream stop traffic" and "yell pop da Glock for Elliot," and what appear to be songs or poems promoting Incel ideology.[9]

Subsequently on April 14, 2021, Judge Wang held a detention hearing, a transcript ("Tr.") of which is attached hereto as Exhibit J. In support of his bail application, the defendant proposed several conditions of release, including a $10,000 bond secured by two financially responsible people, his mother serving as third-party custodian, and a prohibition on live-streaming. The Government opposed the defendant's bail application. Pretrial Services recommended the defendant's release on similar terms as those proposed by the defendant (e.g., no live-streaming prohibition, but requiring two financially responsible people, the defendant's mother as third-party custodian).

---

[9] For example, these songs or poems include Incel references such as, "Stacy's are a stain on earth . . . Don't blame me if I go ER and Burst" and "This is a W for the Incel army Stacy suck Chad dick." In Incel terminology, "going ER" is often used to state an intent to emulate Elliot Rodger by committing an attack; "Stacys" and "Chads" are archetypal females and males, respectively, who are very successful at gaining sexual and romantic attention; and Incels unsuccessfully compete against Chads for Stacys' attention.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 8

After hearing extensive argument from the parties, Judge Wang denied the defendant's application and ordered him detained, finding that the defendant poses both a danger to the community and a risk of non-appearance. Judge Wang elaborated on her findings under both prongs of the bail statute. With respect to the defendant's dangerousness, Judge Wang found that "the acts, videos and statements taken together with the professed support for the Incel movement and particularly the acts alleged in paragraph 5(b) of the Complaint suggest a continued danger to the community," Tr. 29:19-24; noted that the Glock magazines, air soft gun, and paintball gun weigh further toward a finding that the defendant is a danger to the community, Tr. 30:11-24; and concluded that although only 19 years old, the defendant's crimes were very recent, ███ ██████████████████████████████████████████████, Tr. 30:25-31:7. With respect to the risk of flight, Judge Wang expressly found that "the Government has met its lighter burden of a risk of nonappearance." Tr. 31:8-10. Judge Wang stated: "[F]our existing Orders of Protection which arose out of recent incidents where members of the public were sprayed with pepper spray or Mace. They apparently did not help in encouraging Mr. Sanchez to refrain further attacks or assaults on others. These repeated incidents are also, of course probative as to continued danger." Tr. 31:8-16.

## ARGUMENT

### I.   Applicable Law

Under the Bail Reform Act of 1984, the Court may order the pretrial detention of a person charged with an offense if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). This determination involves two steps. First, the Court must assess whether the case involves (a) "a crime of violence," an offense listed in Title 18, United States Code, Section 2332b(g)(5)(B), or another enumerated offense; (b) "a serious risk that such person will flee"; or (c) "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." *Id.* § 3142(f). If one of these criteria is met, then the Court may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *Id.* § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *E.g.*, *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *E.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including, among other things, the defendant's character, ties to the community, past conduct, and financial resources; and (4) whether the defendant poses a danger to any person or the community if released. 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings and the Government is entitled to present evidence by way of proffer, among other means. *Id.* § 3142(f)(2); *see also United States v.*

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 9

*LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); *Ferranti*, 66 F.3d at 542 (same); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

Under Title 18, United States Code, Section 3145(b), a defendant who is "ordered detained by a magistrate" "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." An appeal of a detention order brought pursuant to § 3145(b) is reviewed *de novo*. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

## II. Discussion

The defendant should continue to be detained pending trial. For the reasons described below, a detention hearing was proper, and the defendant plainly poses a substantial danger to the community and a risk of flight, if released.

### a. A Detention Hearing Was Warranted

#### i. The Case Involves a Serious Risk of Non-Appearance

As an initial matter, the defense principally argues that even holding a detention hearing was legally improper. *See* Def. Ltr. at 3-4. The argument is meritless. Holding a detention hearing was proper under multiple prongs of Section 3142(f). First, a detention hearing was proper because the instant case involves "a serious risk that [Sanchez] will flee." 18 U.S.C. § 3142(f)(2)(A). Despite numerous interactions with the criminal justice system – including approximately seven arrests, five of which were spanned a six-month period preceding his instant arrest – the defendant has remained entirely undeterred and has continued engaging in criminal conduct. These interactions include requirements imposed on the conditional discharge for the Queensboro Bridge incident and the ACD on a pepper spray incident, that the defendant not be re-arrested, which the defendant has not upheld. The defendant's recent failure to appear for a scheduled appearance for his three pending New York state court cases further underscores that the defendant has utter and flagrant disregard for the criminal justice system and presents a serious risk of non-appearance in this case. Additionally, as detailed above, in the pepper spray incident from December 2020, the defendant ran when he believed the victim was calling the NYPD because he did not want to get "locked up today." Ex. E. In short, the defendant has demonstrated a willingness to flout the law and judicial directives, which strongly suggests that he is unlikely to appear for future court dates in the instant case.

Moreover, the proof against the defendant is overwhelmingly strong. The relevant conduct is captured on videos recorded by the defendant. The strength of the evidence against the

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 10

defendant—and thus the likelihood of conviction if he proceeds to trial—substantially increases that motivation not to appear for court. Here, the evidence against the defendant is substantial and includes, among other things, the videos that the defendant filmed, anticipated testimony from at least two victims who witnessed the bomb hoax threat, and records from social media and other providers, as well as evidence of other incidents involving the defendant described herein, which the Government would offer pursuant to Rule 404(b).

Further, although the defendant has had multiple prior arrests in New York state, he has not been federally arrested before now, and, ▓▓▓▓▓, has been charged with misdemeanors, not felonies. Sanchez's incentive to evade prosecution in this federal case is thus significant. Relatedly, the potential penalties in this case are substantial. The defendant faces the possibility of a five-year sentence. *See* 18 U.S.C. § 1038(a). Based on the Government's preliminary assessment of the applicable Guidelines range, the defendant would face a recommended Guidelines range of 30 to 37 months' imprisonment.[10] The possibility of a years-long federal prison sentence contributes to the strong incentive to evade prosecution. Finally, as noted in the pretrial report, the defendant has (1) ties in Ecuador (he traveled to Ecuador to visit family approximately three months ago), and (2) minimal financial ties to the community, as his income from food delivery and online "donations" is inconsistent. Critically, after considering the evidence, Judge Wang made the determination that "the Government has met its lighter burden of a risk of nonappearance," noting that the "four existing Orders of Protection which arose out of recent incidents where members of the public were sprayed with pepper spray or Mace. They apparently did not help in encouraging Mr. Sanchez to refrain further attacks or assaults on others. These repeated incidents are also, of course probative as to continued danger," Tr. 31:8-16.

Accordingly, because there is a serious risk that, if released, Sanchez will not appear for court, a detention hearing was plainly appropriate. *See* 18 U.S.C. § 3142(f)(2)(A). Tellingly, the defense letter fails even to address Section 3142(f)(2)(A). Once that subsection, or any other prong of Section 3142(f), is satisfied, a detention hearing is appropriate, and the defendant may be detained on grounds of either (or both) danger to the community or risk of flight. *See id.* § 3142(f); *United States v. Shalva*, No. 89 Cr. 67 (TCP), 1989 WL 62363, at *3 (E.D.N.Y. June 6, 1989) (detaining defendant on dangerousness and risk of flight grounds, after determining that a detention hearing was proper under Section 3142(f)(2)(A)). Thus, the Court need not reach any of the other applicable prongs of Section 3142(f); in any event, as explained below, a detention hearing was also proper under two other prongs of Section 3142(f).

> i. The Case Involves a Serious Risk that the Defendant Will Threaten, Injure, and Intimidate Prospective Witnesses

A detention hearing was also proper because this case involves "a serious risk that [Sanchez] will . . . attempt to threaten, injure or intimidate a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). The very nature of the instant case against Sanchez involves his relentless

---

[10] This Guidelines calculation is preliminary and subject to change as the case and investigation continue, including based on learning additional information about the defendant's conduct and/or criminal history.

harassment, threats, and harm of victims. The defendant's videos reveal in disturbing detail the vitriol he hurls against his victims and how quickly he can be triggered to lash out in violence. If the defendant were not detained, there is a serious risk that he would seek out, threaten, or intimidate witnesses, particularly those whose names and/or contact information he possesses from his interactions during the videos or from the temporary orders of protection. *See United States v. Waldman*, No. 18 Mag. 4701 (SN), 2018 WL 2932729, at *3 (S.D.N.Y. June 12, 2018) (finding that a detention hearing was appropriate under § 3142(f)(2)(B) where the defendant repeatedly threatened and intimidated a victim and thwarted court orders). As set forth in greater detail in Section II.b below, in the face of multiple interactions with NYPD officers, state prosecutors, protective orders, and the state courts, Sanchez did not retreat. Rather, Sanchez continued his criminal conduct. Accordingly, there is a serious risk that, if released, Sanchez will attempt to threaten, injure, or intimidate victims and witnesses, and therefore a detention hearing is proper. *See* 18 U.S.C. § 3142(f)(2)(B).

### ii. The Case Involves an Offense Listed in Section 2332b(g)(5)(B)

Judge Wang also had the authority to hold a detention hearing pursuant to Title 18, United States Code, Section 3142(f)(1)(A).

Section 3142(f)(1)(A) provides that a detention hearing is warranted, in relevant part, "in a case that involves . . . an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(f)(1)(A). Here, Sanchez is charged with violating Title 18, United States Code, Section 1038(a)(1) by "knowingly engag[ing] and attempt[ing] to engage in conduct with intent to convey false and misleading information under circumstances where such information may reasonably be believed and where such information indicated that an activity had taken, was taking, or would take place that would constitute a violation of Title 18, United States Code, Sections 844(i) and 2332a(a)." The predicate offenses underlying the Section 1038(a)(1) charge in Sanchez's case – Sections 844(i) (use of explosives to damage a building or other property) and 2332a(a) (use or threatened use of weapon of mass destruction) – satisfy the requirements of Section 3142(f)(1)(A) because they are listed in Section 2332b(g)(5)(B) and have a maximum sentence of more than 10 years' imprisonment (a maximum penalty of twenty years for Section 844(i) and life imprisonment for Section 2332a(a)). Accordingly, since the charged conduct expressly "involves" offenses that are listed in Section 2332b(g)(5)(B) with statutory maximum penalties exceeding 10 years, a detention hearing was warranted.[11] Specifically, the Government would need to establish "that an activity had taken,

---

[11] The Second Circuit's decision in *United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2584 is not to the contrary. In *Watkins*, the court concluded that the offense of felon in possession of ammunition under Section 922(g)(1) is categorically a "crime of violence" under Section 3142(f)(1)(A). *Id.* at 164. The court rejected, in the "crime of violence" context, the Government's argument that the clause "in a case that involves" should encompass conduct with a nexus to the charged offense. The Government had argued that since the defendant discharged the ammunition from a firearm, his "charged offense of possession of ammunition 'involve[d]' a crime of violence." *Id.* at 163. *Watkins* is inapposite because, rather than requiring the consideration of "related, but uncharged, conduct" like in *Watkins*, here, proving the charged Section 1038(a)(1) offense requires establishing that the defendant's conduct could reasonably have been believed to indicate "that an activity had taken, was taking, or would take place that would constitute a violation of" the predicate offenses listed in Section 2332b(g)(5)(B).

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 12

was taking, or would take place that would constitute a violation of" the predicate offenses listed in Section 2332b(g)(5)(B).

### b. The Defendant Should Be Detained Because He Both Poses a Risk of Danger to the Community and a Risk of Non-Appearance

The defendant clearly poses a danger to the community and is also a risk of non-appearance, and should therefore be detained.

#### i. Dangerousness

The defendant's release, under any conditions, would pose a significant threat to the community.

First, the bomb hoax threat that the defendant conveyed is serious. The defendant made several victims fear for their lives. Sanchez targeted law-abiding individuals who were simply enjoying themselves at a restaurant. Sanchez terrified Victim-1 and Victim-2, who both believed that Sanchez was a terrorist and was about to kill them. They ran halfway down the block in fear, taking shelter in another restaurant. And, even though there was no bomb, Sanchez's actions could have been harmful to the victims and witnesses of Sanchez's bomb threat, as well as to law enforcement – had law enforcement been present or had witnesses attempted to stop Sanchez, someone, including Sanchez, could have been injured or worse.

Second, the nature and seriousness of the danger that the defendant represents based on his proclaimed support for Incel ideology weighs strongly in favor of detention. As described in more detail above, the defendant self-identifies as an Incel and spouts Incel ideology, such as by heaping praise on Elliot Rodger, and including in the context of harassing and in some instances assaulting innocent victims on the streets of New York. For example, on or about February 7, 2021, Sanchez called Elliot Rodger a "good guy" whose victims "deserved to be run over and hit by a truck" and "slaughtered," and said that Rodger "should have blown their brains out a long time ago" (Ex. F); and on or about March 20, 2021, Sanchez stated, among other things, "Elliot fucking Rodgers, baby. I pull out the Glocks, baby. I, I, I do it all day. I really pull out the Glocks and I - I bust that shit" (Ex. H).

Additionally, when law enforcement searched Sanchez's residence they found five magazines that fit a Glock firearm.[12] Law enforcement also identified, among other things, an air soft gun and a paintball gun, as well as pellets; three canisters of pepper spray; a "practice only" canister; and two pocket knives. The defendant's frequent and recent[13] practice of harassing and

---

[12] Rodger reportedly used a Glock 34 pistol, among other firearms, to murder innocent people in California in 2014; as described herein, the defendant has expressed a particular affinity for that firearm in his Incel rants, and magazines for a Glock were discovered in his residence.

[13] Indeed, on the evening before his arrest, law enforcement observed Sanchez in possession of pepper spray while recording a video on the streets of Manhattan. Tr. 16:7-9.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 13

in some instances assaulting people on the street makes his possession of these items even more troubling. As Judge Wang noted at the detention hearing on April 14, 2021, these types of items "are more likely to escalate rather than deescalate and likely to cause injury in any incidents or interactions with the public and with law enforcement." Tr. 30:31-24. Law enforcement also discovered a handwritten note in Sanchez's residence that included the line, "Don't blame me if I go ER and Burst"; as explained above, in Incel terminology, the term "going ER" is commonly used to describe committing an attack in the model of Incel founder Elliot Rodger or "ER," who mass murdered six people in California in 2014. This comment is disturbingly ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and speaks volumes about the defendant's dangerousness.

Third, the history and characteristics of the defendant militate in favor of detention. The bomb hoax threat is of a piece with the defendant's pattern of harassing and spraying pepper spray in strangers' faces. Not including the incident in which the defendant sprayed pepper spray at approximately five people on the pedestrian path below the Queensboro Bridge, the defendant has pepper sprayed at least five victims in just the six months prior to his arrest on the instant charge. Like the bomb hoax threat, these incidents had the potential to cause serious physical harm.[14] The high number of incidents – including after numerous prior arrests – shows that the bomb hoax threat was anything but an aberration and that the defendant will almost certainly revert to criminal conduct if released.

Although only 19 years old, as described above, the defendant has been arrested on approximately seven occasions – including five times in in just the six months prior to his arrest on the instant charge. Those arrests have resulted in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ a conviction for disorderly conduct for the Queensboro Bridge incident (from January 2021); and an ACD for pepper spraying a female victim (from January 2021). For both January 2021 dispositions, the defendant was required, but has clearly failed, to stay arrest-free for a six-month period. Furthermore, the defendant also has pending New York state cases, for pepper spraying people two different individuals. Put simply, the defendant has recently and repeatedly – notwithstanding prior arrests – assaulted innocent pedestrians on the New York City streets by spraying them with pepper spray. These are not "puerile stunts." *See* Def. Ltr. at 1. They are violent incidents, and the defendant is a veritable menace to the community. And it is abundantly clear that the defendant's prior interactions with the justice system have not deterred him from committing these crimes and that he remains a danger to the community, even while facing judicial charges. As Judge Wang recognized, "[w]hile the more serious . . . grand larceny charge did occur when you were only 16, that appears to only have been three years ago. And in the three years

---

[14] According to the National Poison Center's Poison Control, in addition to the typical results of pepper spray, such as irritation and pain to the eyes, skin, and mucus, membranes, which typically last minutes to hours, "more severe injury is possible including corneal abrasions, wheezing, and skin blisters," and "[p]eople with lung conditions, such as asthma or COPD, can have more severe breathing effects when pepper spray is inhaled." *See* Poison Control, National Capital Poison Center, "How Dangerous is Pepper Spray?" https://www.poison.org/articles/how-dangerous-is-pepper-spray-201#:~:text=Pepper%20spray%20causes%20irritation%20of,redness%2C%20swelling%2C%20and%20itching (last accessed May 3, 2021).

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 14

since, there have been a number of arrests that seem to be relating more to Mr. Sanchez's professed support and creating of videos supporting the Incel movement."[15] Tr. 30:25-31:7. Other than advancing the legally specious claim that the Court is not permitted to hold a detention hearing in this case, the defense letter barely even attempts to argue that Sanchez does not pose a danger. And with good reason. The facts and circumstances of this case make clear that he is a danger to the community, and that he should be detained to assure the safety of others, including the next innocent pedestrian he would choose to pepper spray in the face.

      ii.  *Risk of Non-Appearance*

Additionally, the defendant presents a serious risk of non-appearance that cannot be addressed through bail conditions, due to the defendant's personal characteristics, the strength of the evidence, and the serious nature of the charged conduct.

Based on the reasons presented above in Section II.a.i, including that the defendant's frequent interactions with law enforcement have not deterred the defendant from harassing and threatening innocent victims, it is plain that the defendant has no respect for or willingness to abide by court-imposed conditions, and the Government respectfully submits that there is no combination of conditions that could reasonably assure the defendant's appearance, including his proposal of a bond cosigned by his relatives. Indeed, the defendant has already demonstrated his unwillingness to appear for court in his pending state cases. The defendant's proposed residence with his family members, mere blocks away from where he has repeatedly harassed people in videos, is demonstrably insufficient to prevent him from engaging in the same conduct or assure his appearance. These family members appear to be the same persons with whom the defendant proposed staying with in his detention motion before Judge Wang, such that this proposal would effectively return him to where he had been living at the time this troubling conduct occurred. Further, electronic monitoring would not prevent the defendant from engaging in other criminal activity himself. Indeed, the Second Circuit has repeatedly held that the conditions proposed by the defendant are inadequate to overcome a finding of dangerousness. *See United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (because "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology" and "monitoring equipment can be rendered inoperative," district court clearly erred in holding that such conditions alleviate dangerousness) (internal quotation marks omitted); *accord United States v. Dono*, 275 F. App'x 35, 37 (2d Cir. 2008). Nor would a condition prohibiting live-streaming prevent the defendant from continuing to engage in the violent, harassing conduct itself (even putting aside the difficulty of enforcing such a condition).

---

[15] The pretrial report does not contain information about ▮▮▮▮ and the Queensboro Bridge incident, although the Government provided an oral proffer about the latter during the bail hearing. Tr. 15:20. Additionally, Judge Wang was not aware of the underlying facts regarding ▮▮▮▮ Such additional facts now before this Court only further support the conclusion that Sanchez must be detained on dangerousness grounds.

The Honorable Colleen McMahon
United States District Judge
May 5, 2021
Page 15

## **CONCLUSION**

For the reasons set forth above, the defendant's application for bail should be denied.

Very truly yours,

AUDREY STRAUSS
United States Attorney

By: ___/s/_____
Kaylan E. Lasky
Assistant United States Attorney

Cc:  Clay Kaminsky, Esq., *counsel for defendant*