L56KSANC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              21 CR 269 (CM)

5   MALIK SANCHEZ,

6                   Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            May 6, 2021
9                                           12:40 p.m.

10

    Before:
11
                        HON. COLLEEN McMAHON,
12
                                            District Judge
13
                            APPEARANCES
14
    AUDREY STRAUSS,
15       Acting United States Attorney for the
         Southern District of New York
16  KAYLAN E. LASKY
         Assistant United States Attorney
17

    DAVID PATTON
18  FEDERAL DEFENDERS OF NEW YORK
         Attorney for Defendant
19  BY:  CLAY KAMINSKY

20

    ALSO PRESENT:
21
    Francesca Piperato, Pretrial Services Officer
22

23

24

25

L56KSANC

1          (Case called)

2          THE DEPUTY CLERK:  Please state your appearances.

3          MS. LASKY:  Good afternoon, your Honor.  Kaylan Lasky,

4    for the government.

5          THE COURT:  Good afternoon, Ms. Lasky.

6          MR. KAMINSKY:  Good afternoon, your Honor.  Clay

7    Kaminsky, for Malik Sanchez.

8          THE COURT:  Good afternoon, Mr. Kaminsky.

9          THE DEPUTY CLERK:  Also on the line, Judge, is

10   Francesca Piperato, from pretrial services.

11         Did I say your name correctly, Francesca?

12         MS. PIPERATO:  Yes, Francesca Piperato, from pretrial

13   services.

14         THE COURT:  Ms. Francesca, okay, good.

15         And, thank you, Francesca, I got the updated report.

16         MS. PIPERATO:  No problem, your Honor.

17         MR. KAMINSKY:  Your Honor, I don't have the updated

18   report.  Is that something I should have?

19         THE COURT:  The updated pretrial services report tells

20   me when his next court date is in state court.  That's the

21   update.

22         MR. KAMINSKY:  Okay.  Understood, your Honor.

23         THE COURT:  I'm happy to get you a copy.

24         MR. KAMINSKY:  That's fine, your Honor.

25         THE COURT:  Okay.

L56KSANC

1          Mr. Kaminsky, it's your nickel.

2          MR. KAMINSKY:  Thank you, your Honor.

3          So we can get into the facts and why conditions can be

4     set that would assure Mr. Sanchez's appearance in court and the

5     safety of the community, but I think there's an antecedent

6     legal issue, which is whether there can even be a contention

7     hearing in this case.

8          THE COURT:  Yes, I understand the antecedent legal

9     issue, and you are correct that the crime that's charged does

10    not fall within the detention hearing statute.  It's a

11    bootstrap argument that's being made by the government alleging

12    that the hoax — the hoax, h-o-a-x, hoax, pretend thing — that

13    the government has charged this man with, a crime that the

14    government admits, by virtue of its charge, was never intended

15    to be anything other than pretend, is a crime that involves --

16    I'm sorry, makes this a case — not a crime — makes this a case

17    that involves either an 844(i), the use or threatened use of a

18    weapon of mass destruction, even though if it did, the

19    government would have charged that -- I'm sorry, that's the use

20    of explosives to damage a building or property, the government

21    would have charged that if it really did involve that, or

22    2332a(a), two little As, use or threatened use of a weapon of

23    mass destruction.  Boy, if it really involved that, the

24    government would have charged that.  I know this.  I withdrew

25    the Newburgh forces.

1    So, I understand your argument and the government's

2  bootstrap argument.  I don't think I'm going to need to get

3  there.  It presents a fascinating legal issue, it would make a

4  great law school exam question, but I don't think I need to get

5  there.

6    Can we talk about the facts and conditions, please?

7    MR. KAMINSKY:  Yes, your Honor.

8    Your Honor, I think what the conditions should be,

9  which is a little bit more than I proposed in magistrates

10  court --

11    THE COURT:  Right, you didn't propose nearly enough.

12    MR. KAMINSKY:  Your Honor, I think he should be on

13  home detention with electronic monitoring.  His mother, who is

14  in the court here today --

15    THE COURT:  Hello, ma'am.

16    MR. KAMINSKY:  -- Nathali Chamba, who works for the

17  Department of Education, will be a third-party custodian, and

18  he will be on home detention with electronic monitoring.

19  That's my proposal, your Honor.  We can do a bond in the amount

20  that your Honor sees fit.  May.

21    I speak a little bit about the risk of flight because

22  I did some preparation on that?

23    THE COURT:  No, I want you to.  I mean, that's part of

24  what you need to do.

25    MR. KAMINSKY:  Your Honor, there's no reason to

1    believe he's a risk of flight.  I spoke with his Legal Aid

2    attorney, who I actually hoped to have here, but she got caught

3    up in 100 Centre Street.  So here's what happened:  On

4    March 20th, he was arrested after he waited — there was an

5    amazing incident that was charged — he waited for the police to

6    arrive, and he calmly was arrested.  He has never been accused

7    of -- there has never been any bench warrant, there has never

8    been any --

9            THE COURT:  What was the date of the hearing he

10   allegedly missed?  Was that the one that was five days after he

11   was put in the Essex County detention facility?

12           MR. KAMINSKY:  No, your Honor.  There is -- in

13   fairness to the government, there was an earlier one on

14   March 8th, and here's what happened:  They gave him a slip of

15   paper when he was arrested that said he was supposed to go to

16   100 Centre Street.  They also took his phones.  He communicated

17   diligently with his attorney by email.  It turned out that it

18   was supposed to be a remote hearing.  His attorney wrote him an

19   email, which he didn't check because he didn't have the phone.

20   He later got it that day.  His attorney told him about the

21   hearing on the day of.  I have this in confirmation from the

22   Legal Aid attorney.  Her name is Jacqueline Dombroff.  She told

23   him that day.  He didn't get the email.  He wrote her that

24   night and said, oh, no, it looks like I missed it, can we

25   reschedule?  And then he kept in touch with her after that.  He

1  kept in touch with her before that and after that.  A ball was

2  dropped.  It was not, in candor and in fairness, dropped by

3  Mr. Sanchez.  He was in touch with his attorney.  He was not

4  given the information of where he needed to go, no bench

5  warrant was issued, no bench warrant has ever been issued.

6       THE COURT:  That's because there are a lot of problems

7  over there right now.  I mean, let's not kid ourselves.  I've

8  been in touch with a number of state court judges, including

9  the chief judge, and they're having difficulty getting their

10  operations restarted.  It's a much more complicated and

11  cumbersome process than we have to go through.  We're very

12  lucky here.

13       MR. KAMINSKY:  Yes.

14       THE COURT:  So, there are balls getting dropped, and I

15  understand that.  Then he missed a hearing on the 19th of

16  April, but he couldn't very well go because he was in Essex.

17       MR. KAMINSKY:  Correct.  And he was basically kept

18  incommunicado because he was under quarantine.

19       THE COURT:  Right.

20       MR. KAMINSKY:  He successfully completed probation

21  once before.  Another element that we might make part of the

22  bail package is mental health treatment.  He previously was

23  under the care of a psychiatrist, he got medication, he was in

24  counseling.  The care of the psychiatrist ended some years ago.

25  The counseling ended because of the pandemic, and it's during

1    the pandemic that he appears to have started reaching out in

2    this way through YouTube.  You know, I think that psychological

3    and psychiatric care could be part of the bail package, your

4    Honor.

5         THE COURT:  Oh, yeah, oh, yeah, anybody who thinks

6    what I saw in the video was funny is definitely in need of

7    mental healthcare, definitely.

8         MR. KAMINSKY:  Your Honor, the videos clearly aren't

9    funny.

10         THE COURT:  They're not funny.

11         MR. KAMINSKY:  But they're also not a reason to detain

12    a 19-year-old.

13         The other reason, the risk of flight, the government

14    says that his guidelines range is 30 to 36 months.  It's not.

15    That's giving him all kinds of enhancements that don't apply.

16    It is also using each time he says in that 30-second clip that

17    he's going to detonate a bomb is a separate incident of a

18    threat, to say that there's more than one threat.  I calculate

19    his guidelines at either zero to six, if he gets credit for

20    this being a one-time thing, where there was a little

21    forethought, or if he doesn't get that credit, then six to

22    twelve.  He's in criminal history category --

23         THE COURT:  I take the guidelines -- presumptive

24    guidelines into account very slightly on a crime of this

25    nature.

L56KSANC

1          MR. KAMINSKY:  Yes, your Honor.

2          THE COURT:  This is a crime with a five-year statutory

3    maximum penalty.  You know how often I see crimes with a

4    five-year statutory penalty?  Maybe once every three years.

5          MR. KAMINSKY:  I don't see them very often either,

6    your Honor.

7          This is -- the government goes into his juvenile

8    records and goes through allegations that weren't even

9    substantiated.  I'm not sure -- look, he says some upsetting

10   things, but he's bailable.

11         THE COURT:  Okay.  I'll hear from the government.

12   I've read your letter.

13         MS. LASKY:  Thank you, your Honor.  I won't belabor

14   all of the different points that we make in our letter.  I will

15   highlight a few things, however, for the government's position,

16   which, first of all, I think it's very important to note that

17   despite repeated interactions with the criminal justice system,

18   the defendant is not changing his behavior.  This is, of

19   course, in reference to the multiple different arrests --

20         THE COURT:  Yes, but those are state court crimes, and

21   the state court will deal with them.  And this Court will not

22   be used as a vehicle to get around the state's policy decisions

23   on bail.  Okay?  I won't be used in that way.  I will not be

24   used in that way.

25         MS. LASKY:  Understood, your Honor.

L56KSANC

1          THE COURT:  So, okay.  He's got some state crimes that

2    he's been accused of — low-level felony, high-level

3    misdemeanors, I think there are three.  He is -- maybe one of

4    them was already disposed of.  He has state court appearances.

5    The state let him out on those.  That's the state's business,

6    it's not mine.  And I'm not making a bail decision on the basis

7    of the state court crimes of which he has not yet been

8    convicted.  Okay?  I will not make a bail decision on that

9    basis.

10         MS. LASKY:  Understood, your Honor.  It's his response

11   to judicial and criminal intervention that is of concern to the

12   government.

13         THE COURT:  Why?  He had one meaningful response to

14   judicial intervention, and he seems to have gotten through it

15   all right, and then for three years, he didn't do anything.

16         MS. LASKY:  Correct, your Honor.  It's the pattern of

17   behavior, particularly in the last six months.  And,

18   understood, your Honor, but I think with the recent cases that

19   have been disposed of, as your Honor pointed out, there is the

20   adjournment in contemplation of dismissal, also the conditional

21   discharge for climbing the Queensboro Bridge.  Both of those,

22   as I understand it from communications with the state

23   prosecutor, included a condition that the defendant not get

24   rearrested for six months.

25         THE COURT:  And the state court can take care of it.

L56KSANC

1          MS. LASKY:  Understood, your Honor.

2          THE COURT:  He's got to go in front of a state judge

3     on the 19th of May.  I don't know whether in person or

4     virtually, but he has to do that.  And if at that time, the

5     state court, which will undoubtedly be apprised of what you

6     have charged him with, says, you've got yourself arrested,

7     guess what — that's the state court's business, it's not my

8     business.

9          MS. LASKY:  Yes, your Honor.

10         Additionally, the evidence in this case is very

11    strong.  As you've seen already, your Honor, much of this

12    conduct, and the conduct particularly charged here in the bomb

13    threat, is on video, and we also have social media records,

14    statements from victims, which also provide strong incentive to

15    flee.  There is also one video --

16         THE COURT:  How do they provide incentive to flee?

17         MS. LASKY:  The fact that the evidence in the case is

18    strong, your Honor.

19         THE COURT:  Okay.  When guys are arrested with drugs,

20    the evidence is strong, and they're presumption cases, and

21    frequently people are let out.  This is not a presumption case.

22    Yes, I've seen the crime.  I've seen it, because he videotaped

23    it, and he broadcast it on YouTube, and it's disgusting.  It's

24    absolutely disgusting.  It's juvenile, it's puerile, it's

25    deeply troubling, but it's bailable.

1          MS. LASKY:  Yes, your Honor.

2          Your Honor has also pointed out that this is the most

3     serious -- well, not in these words exactly, but it is the most

4     serious charge the defendant has appeared to face.

5          THE COURT:  Yes, the most serious charge he has

6     appeared to face is that he perpetrated a hoax, he did

7     something pretend, which, under federal law, subjects him to a

8     greater punishment than spraying somebody with pepper spray

9     does under state law.

10          MS. LASKY:  Correct, your Honor, which also

11     provides --

12          THE COURT:  Absolutely true.  One of the oddities of

13     federal law, that a real incident subjects him to, I don't

14     know, one to three, and a hoax can subject him to as much as

15     five years.

16          MS. LASKY:  Yes, your Honor.

17          THE COURT:  Right.

18          MS. LASKY:  So it's --

19          THE COURT:  Got that.

20          MS. LASKY:  Understood, your Honor.

21          So it's for these reasons, your Honor, that the

22     government contends that he is a risk of flight.  And I

23     understand you've read the government's submission, so I won't

24     belabor --

25          THE COURT:  I have, I have, and I find that this

1  defendant poses no serious — by the way, the statute does say

2  serious — serious risk of nonappearance if he is released on

3  the conditions I would propose, which it turns out Mr. Kaminsky

4  has come to his senses and realized are the conditions that he

5  should have proposed all along, which are home confinement, on

6  a bracelet, with mental health counseling.  He's had two

7  encounters with the criminal justice system that would be

8  pertinent.  He's complied with the conditions of probation for

9  two years, which does not necessarily suggest that he would

10 fail to abide by the orders of this Court.

11          He failed to attend one videoconference on his state

12 law case in March.  I have nothing but respect for the state

13 courts as a former state court judge.  I have some

14 understanding of what they must have been laboring under for

15 the last year.  I would give pretty much anybody a pass on that

16 basis because I know what difficulty they are having getting

17 restarted, getting people noticed, and things like that.  I

18 accept the proffer of Mr. Kaminsky from his state court lawyer

19 that the defendant, as soon as he became aware of the

20 conference, asked his lawyer to have it rescheduled, which does

21 not suggest that he is someone who is trying to avoid coming to

22 court when he's required to come to court.  He obviously missed

23 his conference on April 21st, but that's because he was in the

24 Essex County Jail.  And I want to make sure he doesn't miss the

25 next conference, so that the state court judge can decide

1  whether, in light of what has happened since he or she last saw

2  Mr. Sanchez since he was arrested, the dispositions on the

3  previous state court cases should be reversed, or that new

4  conditions should be set, or even that they should put him in

5  on bail on his state court case.  That's a decision for the

6  state court judge to make at his next scheduled appearance.

7          It's my assessment that if he's kept in his parents'

8  home 24/7 on a monitoring bracelet, he does not present a

9  serious risk of nonappearance.

10          Do you want to argue danger?

11          MS. LASKY:  If your Honor is saying that danger is not

12  pertinent because we're not capable of getting to that place,

13  then I won't waste the Court's time, your Honor.

14          THE COURT:  Well, yeah, because I just don't think you

15  even come close on nonappearance.  I really don't.

16          MS. LASKY:  Understood.

17          THE COURT:  So I, again, with great respect for

18  Judge Wang, she was in a position where she had to make a

19  decision fairly quickly.  I've had a lot of time to consider

20  this.  They don't have that luxury upfront in the arraignment

21  part, but --

22          MS. LASKY:  Yes, your Honor.  The government also does

23  raise the argument about serious risk that the defendant will

24  threaten or intimidate witnesses --

25          THE COURT:  There's absolutely no proof that this

L56KSANC

1    defendant would threaten or intimidate a witness or that he

2    even would know how to do so.  His crimes, the things he's done

3    that I've seen on tape, involved his going up to total

4    strangers.  He doesn't know their names, he doesn't know where

5    they live.  How is he supposed to intimidate them?

6          MS. LASKY:  There is at least one incident, your

7    Honor, where a person associated with one of the macing victims

8    calls 911, her contact information was posted as part of his

9    video.  His followers, as I understand it, have since actually

10    doxxed her, meaning they have sent her text messages and posted

11    her information.

12          THE COURT:  Has he?

13          MS. LASKY:  No, your Honor, but I'm saying --

14          THE COURT:  Has he violated any of his orders of

15    protection?

16          MS. LASKY:  Not as far as I know, your Honor.

17          THE COURT:  Fine.  Because if he violates an order of

18    protection, all you have to do is call Mr. O'Neill, and he will

19    be in so quick, his head won't have stopped spinning.

20          MS. LASKY:  Understood, your Honor.  I was just saying

21    there was one instance where he knows the contact information

22    and name of an individual.

23          But, understood, your Honor.  If it's preferable to

24    the Court, at this point, to talk about conditions --

25          THE COURT:  I think we should talk seriously about

1    conditions.

2           MS. LASKY:  Okay, your Honor.

3           THE COURT:  This is a young man who, as far as I can

4    tell -- if you watched the video, and I have, of the incident

5    that underlies this case, the first thing I thought was, this

6    is a kid who needs to be seeing a psychiatrist, this is

7    somebody who needs mental health counseling.  I don't know if

8    he needs to be on medication, I have no idea, I'm not that kind

9    of a professional.  Mr. Kaminsky tells me he has previously

10   been on medication, so that it's possible that this is the

11   process of being off his meds.  I don't know.  A lot of these

12   kinds of things have cropped up during the pandemic.  So we

13   definitely need to get a mental health counselor, we definitely

14   need to have him imprisoned, in quotes, in his home.  But he

15   comes from what appears to be a good, solid family, with whom

16   he has appropriate parental child relationship, lives with his

17   family.  I just think that home confinement here — I don't know

18   what else the government needs or wants — but with a relatively

19   low bond, and an appropriate number of cosigners, and a little

20   speech from me, we should be able to -- travel documents

21   surrendered, no travel plus home confinement means home

22   confinement, as he's about to find out, I think we should be

23   able to dispose of this case fairly quickly, because I will say

24   one thing for the government, it has very strong evidence.

25          MS. LASKY:  Your Honor, if I may, at the last

L56KSANC

1    conference, as I recall, defense counsel had suggested a

2    prohibition on live streaming.

3            THE COURT:  Yes, that would be included in my

4    conditions as well.

5            MS. LASKY:  So would that be -- just to clarify for

6    the record, would that be a prohibition on using an

7    internet-capable device in order to ensure that that is adhered

8    to, your Honor?

9            THE COURT:  I don't think he can communicate with his

10   lawyer.

11           MR. KAMINSKY:  Yes, he's got to have internet access,

12   so I can send him discovery, so he can do remote proceedings in

13   the state.  You'll know if he posts, right?  I'm sure --

14           THE COURT:  I assume pretrial can monitor that and

15   will know if he posts.

16           Francesca, are you still on?

17           MS. PIPERATO:  Yes.

18           THE DEPUTY CLERK:  Did you hear the question?

19           THE COURT:  So the question here is:  We want to put a

20   prohibition on him, as a condition of pretrial release, that he

21   not post videos, or chats, or messages on the internet.  Is

22   there some way that you all can monitor that?  I want him to be

23   able to communicate with his attorney, so he needs to have

24   email.

25           MS. PIPERATO:  There's a little static on the line.

L56KSANC

1        THE DEPUTY CLERK:  Hold on.  The Judge will pick up

2   the line.  Let me just make sure we can do that.

3        THE COURT:  No, I don't think we can do that.

4        THE DEPUTY CLERK:  I have two people on it.

5        Should I ask her the question, Judge?

6        THE COURT:  Yes.  I'm going to ask Mr. O'Neill, who's

7   at a better microphone, I think.

8        THE DEPUTY CLERK:  Francesca?

9        MS. PIPERATO:  Yes.

10        THE DEPUTY CLERK:  The Judge is asking:  One, do you

11   have the ability to monitor the defendant's online activity?

12        MS. PIPERATO:  We can monitor his computer.  If the

13   defendant has a laptop, we can monitor if he's not to have,

14   like, social media accounts.  We can see what he views on that

15   one computer, or laptop, or iPad.

16        THE COURT:  Okay.  And his phones have been

17   confiscated, right?  The government has his phones, correct?

18        MS. LASKY:  Yes, your Honor, although that is not to

19   stop him from getting a new phone, of course.

20        But my understanding from another case that was

21   somewhat analogous was that there might be issues if he, for

22   example, started a new account or used a different streaming

23   service that pretrial was not aware of, and so, in that case,

24   it was set that he or she, in that case, was not able to use

25   the internet except to communicate with lawyers or for medical

1    reasons with the permission of pretrial, your Honor, for that

2    reason.

3            THE COURT:  Okay.  Well, that's a good condition.

4            I do have another question for you that Mr. O'Neill

5    reminds me.  What has happened to the magazines?  Which was

6    really the only truly concerning thing in the underlying

7    record, was the magazines.

8            MS. LASKY:  They're part of the arrest evidence, your

9    Honor.

10           THE COURT:  Okay.  So you've got them?

11           MS. LASKY:  Yes, your Honor.

12           THE COURT:  Okay.

13           Well, I have the most recent report from pretrial,

14   which does recommend, continues to recommend, that the

15   defendant be released on bond, cosigned by two financially

16   responsible persons, with the defendant's mother to sign as the

17   third-party custodian, and with a number of conditions.

18           So, I'm going to do that, and so we need to have a

19   $10,000 bond, to be signed by two financially responsible

20   persons.  That means they have to be acceptable to the

21   government.

22           And, ma'am, I'm going to make you what's called a

23   third-party custodian of your son.  Okay?

24           So, Mr. Sanchez, I'm going to have to explain how

25   you're going to live until this case gets resolved or until the

L56KSANC

1  state court does something with you, which they have a perfect

2  right to do in connection with their cases.

3          You're going to live at home.  You're going to have an

4  electronic monitoring bracelet put on you, a location

5  monitoring bracelet, so that your pretrial services officer who

6  is supervising you will know if you leave the house.  And

7  you're only allowed to leave the house — you're only allowed to

8  leave the house — to meet with your lawyer at times that are

9  preapproved by your pretrial services officer, to meet with a

10  doctor — I know many of these doctors' appointments, especially

11  counseling appointments, are taking place virtually these days,

12  which is another reason that we can't completely cut the

13  defendant off from the internet, because the mental health part

14  of this is very important to me — but to have medical

15  appointments, to come to court, to attend religious services,

16  and that's it.  That's it.  Other than that -- and all those

17  things have to be cleared in advance with your pretrial officer

18  because the officer knows that at 10:00 o'clock in the morning

19  on June 10th, you're going to be at your lawyer's office.  All

20  right?  But other than that, you can't leave the house.  You

21  can't be working for DoorDash, I'm sorry, you can't be dashing

22  around town.

23          So, in essence, you're going to stay in jail, but jail

24  is going to be your parents' home.

25          THE DEFENDANT:  I understand.

L56KSANC

1          THE COURT:  Okay.

2          The minute that -- the pretrial officer is going to

3    help your family set this up, and there will be a phone in your

4    home that when they call, you better pick up that phone,

5    because if you don't pick up that phone, the next call they're

6    going to make is to me, and, at that point, the government's

7    position here becomes much more convincing to me, and I'm very

8    happy to sign a warrant for your arrest.  You don't have any

9    margin for error here.  One misstep, you're going in.  I can't

10   say it any more clearly than that.  I want you to understand

11   it.

12         Now, here are the conditions:

13         One, you surrender your passport, all travel

14   documents, and make no new applications under any name for

15   travel documents;

16         You're restricted to the Southern and Eastern

17   Districts of New York, but you're on home confinement, so,

18   basically, that means that what you can do is go to religious

19   services or go to court here in the Southern District of New

20   York, but not in Connecticut and not in New Jersey;

21         You'll obtain or maintain employment as approved by

22   pretrial or be involved in educational programs as approved by

23   pretrial, but it cannot be a kind of employment that requires

24   you to have internet access or that allows you to be dashing

25   all over town.  That's -- excuse me, no, you're going to talk

L56KSANC

1   to your lawyer, not to me.  Let me finish with the conditions.

2   Okay?

3           You are required to have mental health evaluation and

4   treatment.  You are very much in need of some mental health

5   counseling, very much, based on what I've seen so far.  And if

6   medication is prescribed for you by a mental health treatment

7   provider, you must take the medication.  That's a condition of

8   your supervision;

9           You may not possess a firearm, a weapon, or

10  destructive device, or — let me underscore this — ammunition

11  for a firearm, weapon, or destructive device;

12          You have to make all your state court dates;

13          You have to abide by the temporary orders of

14  protection that have been entered against you, have absolutely

15  no contact with any of your victims on the state crimes or this

16  crime.  Should you have any knowledge of who they are or a way

17  to do that, you can have no contact with them at all;

18          Your use of the internet during your pretrial

19  supervision period is limited to contact with your lawyer, and

20  the mental health treatment provider, and your pretrial

21  services officer.  That's three people — your lawyer, pretrial,

22  the mental health counselor — nobody else, nobody else;

23          You may not post any tweets, sweets, videos,

24  Instagrams under your name or any other name or handle of any

25  sort while this is pending.

L56KSANC

1          Do you understand me?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Good.  Because I hear about one, in you

4     go.

5          Yes, Mr. Kaminsky.

6          MR. KAMINSKY:  It occurs to me, your Honor, that so

7     limiting his internet usage may prevent him from applying for

8     jobs, which I think might be a good thing.

9          THE COURT:  Whether he applies for a job or not is up

10    to pretrial.  I'm inclined to leave him where he is; I'm

11    inclined to leave him in his home.

12         MR. KAMINSKY:  Okay.

13         THE COURT:  All right.  At least until the mental

14    health counselor gets a hold of him, and we know what we're

15    doing.  But what I said was obtain and maintain employment as

16    approved by pretrial, educational programs as provided and

17    approved by pretrial.  Pretrial may want him to go to school, I

18    don't know, but I need him to be off the internet as much as

19    humanly possible, okay?  So if there's something that comes up,

20    Mr. Kaminsky, that would require a modification of this

21    condition, you can talk to the government, and you can always

22    come to me.

23         MR. KAMINSKY:  Understood.

24         The other issue, and maybe this is asking for too

25    much, your Honor, is it occurs to me if he's going to be in his

L56KSANC

1   apartment all day and not able to work, it might be good for

2   him to be able to use Netflix or something like that.

3        THE COURT:  Mr. Kaminsky, I've imposed a condition.

4   Your client --

5        MR. KAMINSKY:  I'll send him some books, your Honor.

6        THE COURT:  Your client used the internet to broadcast

7   something that never should have happened, and I really think

8   this is a bailable case, but that's all I think, Mr. Kaminsky.

9        MR. KAMINSKY:  Understood.

10       THE COURT:  I watched that video.  That is a terrible

11  thing to do to anybody — a terrible thing to do to anybody —

12  and he used the internet to do it.

13       Also, Francesca, from pretrial, I want drug testing.

14       MS. PIPERATO:  I'm sorry, your Honor, I couldn't hear.

15       THE COURT:  Drug testing.  I'm imposing that as a

16  condition.

17       THE DEPUTY CLERK:  Francesca, the Judge is asking if

18  drug testing condition is appropriate.

19       THE COURT:  No, I'm saying it's going to happen.  I've

20  decided it's appropriate.

21       THE DEPUTY CLERK:  It will be listed, Francesca.

22       MS. PIPERATO:  Okay.  Can I, if possible, clarify one

23  condition that I didn't hear?

24       THE COURT:  Yes.

25       MS. PIPERATO:  Home detention with location

L56KSANC

1    monitoring?

2              THE COURT:  That is correct, Francesca.

3              MS. PIPERATO:  Okay.  If possible, can it please be

4    noted that the defendant is permitted to self-install the

5    equipment at the direction of pretrial services?

6              THE COURT:  Francesca, I'm not sure how that works.

7    We have here a crime that is alleged to have been committed

8    using the internet.  I want him to have as little to do with

9    this as possible, but if you can provide the equipment and

10   instructions for how to install it?  Is that what you want to

11   do?

12             MS. PIPERATO:  Well, for the home detention, because

13   I'm talking about the bracelet, it allows us to have him report

14   home and directs him --

15             THE COURT:  Wait, wait, wait.

16             THE DEPUTY CLERK:  Francesca, stop.

17             THE COURT:  Slow down, Francesca.

18             THE DEPUTY CLERK:  You're going to start from the top.

19   The court reporter did not get what you said.  Explain what

20   you're trying to tell the judge.

21             MS. PIPERATO:  Okay.  For home detention with location

22   monitoring, we would ask the Court to note that the defendant

23   be permitted to self-install the equipment.  This allows us to

24   direct the defendant to report home and to his installing the

25   remaining equipment with our direction.

L56KSANC

1          THE COURT:  Okay, if that's what you're doing these

2     days.  Is that what you're routinely doing these days,

3     Francesca?  Is that the usual procedure these days?

4          MS. PIPERATO:  Yes, it is.

5          THE COURT:  Okay.  Then fine.

6          MS. PIPERATO:  And for the computer monitoring, if the

7     Court would like to know, pretrial services is to monitor the

8     defendant's computer, then we would have somebody install that

9     equipment and monitor his internet access.

10          THE COURT:  Okay.  Well, pretrial services must

11    monitor his computer usage, must monitor his computer usage.

12          MS. PIPERATO:  Yes.

13          THE COURT:  So I understand you're trying to avoid

14    making a home visit.  You may have to make a home visit, or

15    somebody from your office who is vaccinated may have to make a

16    home visit in this case, but whatever equipment is needed has

17    to be installed.

18          MS. PIPERATO:  I believe the equipment for the

19    computer, I don't think we physically have to be there to

20    install it.

21          THE COURT:  I'm sorry, I didn't understand that.

22          THE DEPUTY CLERK:  Repeat that, Francesca.

23          MS. PIPERATO:  For the computer monitoring equipment,

24    I'm not exactly sure if someone has to physically be there or

25    have the defendant report to the office.  I can get

L56KSANC

1    clarification on that.

2              THE COURT:  Ah, okay.  You'll need to get

3    clarification on that because I really have to tell you, I'd

4    rather somebody went to his home and installed it.

5              Were there other conditions?

6              MS. LASKY:  If I may, your Honor, just to clarify —

7    sorry — again, on the internet point, is it your Honor's

8    condition that he is not to have his own internet-capable

9    phone, such that he could have a flip phone if he's calling his

10   lawyer, for example, or something?  I just don't know if

11   pretrial can similarly monitor a phone that is capable of using

12   the internet.

13             THE COURT:  I know less than you know.  I know less

14   than you know.  If there is a phone, a noninternet-capable

15   phone, that will allow him to call his lawyer, fine, but I know

16   for a fact that he's going to need to have some

17   internet-capable device in order to have the mental health

18   counseling, because it's not going to be in person, it's going

19   to be remote.  That's what they're all doing these days.

20             MS. LASKY:  Understood, your Honor.  I think it's the

21   difference between having your own device or, for example,

22   using a family device that isn't a constant temptation, but I

23   defer to your Honor about the most elegant way to craft it,

24   your Honor.

25             MR. KAMINSKY:  Your Honor, I think we can let pretrial

L56KSANC

1   sort it.  I do believe they can monitor phones, but if they

2   can't, obviously he can't have an internet-accessible phone.

3           THE COURT:  Okay, fine.  That's fine with me.

4           MR. KAMINSKY:  Your Honor --

5           THE COURT:  Somehow I rather imagine that we may as

6   well have an initial conference.  I rather imagine that the

7   government has provided all the discovery that it really needs

8   to provide.

9           MS. LASKY:  Your Honor, we have not.  We will be able

10  to do so in a matter of a week or two, your Honor.  The

11  government and defense --

12          THE COURT:  Has he been arraigned, by the way?

13          MS. LASKY:  I'm sorry?

14          THE COURT:  He has not been arraigned, yet, on the

15  indictment?

16          MS. LASKY:  Correct, your Honor.

17          THE COURT:  Can we arraign him?

18          MS. LASKY:  Thank you, your Honor.

19          THE COURT:  I had no idea.

20          THE DEPUTY CLERK:  Mr. Sanchez, the United States

21  Attorney for the Southern District of New York has filed an

22  Indictment 21 CR 269, which charges you in one count with false

23  information and hoaxes.  It states that on or about

24  February 13, 2021, in the Southern District of New York, you

25  knowingly engaged, and attempted to engage, in conduct with

L56KSANC

1    intent to convey false and misleading information under

2    circumstances where such information may reasonably be

3    believed, and where such information indicated that an activity

4    had taken, was taken, or would take place that would constitute

5    a violation of Title 18, United States Code, Sections 844(i)

6    and 2332a(a), to wit, you conveyed a hoax, threat to detonate a

7    bomb in the vicinity of a restaurant in Manhattan, in violation

8    of Title 18, United States Code, Section 1038(a)(1) and 2.

9           Have you received a copy of this indictment?

10          THE DEFENDANT:  Yes.

11          THE DEPUTY CLERK:  Have you discussed it with your

12   attorney?

13          THE DEFENDANT:  Yes.

14          THE DEPUTY CLERK:  How do you plead at this time to

15   this indictment?

16          Counsel?

17          THE COURT:  Counsel, you want to enter a plea for him?

18          MR. KAMINSKY:  Not guilty, your Honor.

19          THE COURT:  Thank you.

20          Okay.  So if the government can finish producing

21   discovery within ten days, Mr. Kaminsky, how much time do you

22   want?

23          MS. LASKY:  Your Honor, just to clarify, the

24   government and defense counsel -- I believe defense counsel is

25   considering our protective order, so we will want to have that

L56KSANC

1    in place, but then ten days should likely be enough, but we

2    have some large videos that the issue has been trying to

3    transfer them and all the technology there, so those might take

4    a little bit longer, but the bulk of it, we can get out, your

5    Honor.

6             THE COURT:  Mr. Kaminsky?

7             MR. KAMINSKY:  I haven't seen the protective order.

8    I'm not sure why we need one for stuff that was on the

9    internet, but we'll discuss it.

10            Wait, have you sent me a protective order?

11            MS. LASKY:  Yes.

12            MR. KAMINSKY:  I have not read the protective order

13   that apparently has been sent to me.

14            I don't think I need more than 30 days to review the

15   discovery, your Honor.  The reason why I don't want to rush

16   things is because I might make an application to the Young

17   Adult Opportunity Program, I want to see how the treatment

18   goes.  So there are things that are going to be going on other

19   than just my reviewing the discovery, your Honor.

20            THE COURT:  Well, when should we set this for, the

21   next conference?

22            MR. KAMINSKY:  I would say late June, your Honor.

23            THE COURT:  How about July -- I want to be here.  I

24   have July 6, 7, 8, 12, 13, 14, 15.

25            MR. KAMINSKY:  Could we do 12, 13, or 15, your Honor?

L56KSANC

1          THE COURT:  Yes.  We can do the afternoon of the 12th,

2     anytime on the 13th.

3          Jim, what have we got?

4          THE DEPUTY CLERK:  3:00 o'clock on the 13th.

5          THE COURT:  Is that okay with the government?

6          MS. LASKY:  Yes, your Honor.

7          THE COURT:  Okay.  So 3:00 o'clock on Tuesday,

8     July 13th.  That will be in this courtroom, unless you get a

9     notice that it's been moved to another courtroom, because my

10    courtroom can be used for trials.

11         MR. KAMINSKY:  Your Honor, there remains the question

12    of whether Mr. Sanchez can be released today or only once the

13    signatures are on the bond.

14         THE COURT:  I really think we should get everything

15    signed and sealed, please.

16         MR. KAMINSKY:  We'll move expeditiously, your Honor.

17         THE COURT:  Thank you very much.

18         So, Mr. Sanchez, I mean business.  So I'm letting you

19    go home, but home really is jail, and I mean it.  And you

20    better cooperate with your pretrial officer, you better

21    cooperate with your lawyer, you better cooperate with the

22    mental health treatment, you better not think you're smarter

23    than I am, because you're not, you better stay off the

24    internet, and you will be back in this courtroom on the

25    afternoon of July 13th, and we'll see how things are going.

L56KSANC

1          Time is excluded in the interests of justice, the

2     defendant's interests in a speedy trial being outweighed by the

3     need for the government to complete the production of

4     discovery, and with the defendant's consent, correct?

5          MR. KAMINSKY:  Yes.

6          THE COURT:  Okay.  Thank you.

7          Anything else?

8          MS. LASKY:  Just one remaining question from the

9     government on an administrative note:  The copy -- the

10    submission that I filed yesterday, whether I can submit a

11    redacted copy of that on the docket?  Because it --

12         THE COURT:  Yes.

13         MS. LASKY:  Thank you, your Honor.

14         I guess one other administrative note, just to note

15    for the record, is the pretrial conference that was previously

16    scheduled will be --

17         THE COURT:  Yes, we'll just get -- move that over to

18    July 13th.

19         MS. LASKY:  Thank you, your Honor.

20         THE COURT:  There's no reason to bring you back again.

21         MS. LASKY:  Right.

22         THE COURT:  Okay.

23         MS. LASKY:  Okay.

24         THE COURT:  All right.  Thank you, everybody.

25         Ma'am, sorry to make you his jailer, but we'll see

L56KSANC

1    what happens.  Okay?

2              Just remember, one misstep, you're going in.

3              THE DEFENDANT:  Thank you.

4                                  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25