

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 30, 2022

**BY ECF**

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:      *United States v. Sanchez*, 21 Cr. 269 (CM)

Dear Judge McMahon:

      The Government respectfully submits this letter in advance of the sentencing of defendant Malik Sanchez, a/k/a "Smooth Sanchez" ("Sanchez" or the "defendant"), scheduled for April 6, 2022, at 12:00 p.m.

      On February 13, 2021, Sanchez conveyed a hoax bomb threat outside of a Manhattan restaurant, causing diners to flee in fear. Sanchez recorded himself making this threat, for his and his online followers' amusement. This despicable act was part of a disturbing pattern in which Sanchez posted online hours upon hours of recordings in which he harasses and, in multiple instances, pepper sprays innocent victims on the streets of New York. In many of these videos, Sanchez self-identifies as an "Incel" or "Involuntary Celibate," proclaiming support for the extremist, largely online group that spews misogynistic vitriol, promotes violence towards women, and has been responsible for carrying out horrific acts of violence in recent years.

      Sanchez's actions were serious, and caused emotional harm to his victims. For the reasons set forth below, a sentence within the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 8 to 14 months' imprisonment (the "Guidelines Range") is warranted.

**I.    Factual Background**[1]

      For years, Sanchez has engaged in a pattern of destructive and in many instances criminal conduct. A summary of this factual background, including the charged conduct, is set forth below.

---

[1] Because this submission includes information about the defendant's juvenile records, the Government respectfully seeks the Court's permission to redact such information herein. The Government is filing a redacted version of this letter on ECF, and providing the Court and defense counsel with an unredacted copy.

**A. 2018 –** ██████



██████ *See* U.S. Probation Office's ("Probation") Presentence Investigation Report, dated February 16, 2022 ("PSR") ¶ 46 (described in part).

██████ *Id.* ¶ 27 (described in part).

██████ *Id.*

**B. October 2020 to February 7, 2021 – Harassment, Pepper Spray Incidents, and Proclaiming Support for Incel Ideology**

Starting in at least 2020, the defendant, who goes by the name "Smooth Sanchez" online, began posting to social media and other Internet accounts – which appear to be livestreamed[2] – videos for online followers. Over time, and as his conduct escalated as described below, Sanchez became a self-identified supporter of the radical "Incel" movement. In many of these videos, the defendant walks in public areas, typically in Manhattan, and harasses, and, in some instances, harms innocent strangers going about their daily lives. The defendant's online followers publicly "donate" funds to Sanchez in real-time, using an online video service, to reward or encourage his conduct. Sanchez also sometimes broadcasts in real-time the messages that his followers type during his livestreams, using a text-to-speech function that converts text into natural-sounding speech.

As noted above, in Sanchez's videos, he consistently self-identifies as an "Incel" and expresses support for "Incel" ideology. The term "Incel" refers to members of a group founded on the belief that society unjustly denies them sexual or romantic attention, to which they believe they are entitled. *Id.* ¶ 8. The Incel community is primarily an online community composed of individuals, mostly men, who blame political or social movements like feminism for empowering others to deny them romantic or sexual attention. *Id.* Incels have conducted at least five lethal attacks in the United States and Canada since 2014, resulting in 28 deaths. For example, in May 2014, Elliot Rodger, whom Incels generally regard as the group's unofficial founder – and who Sanchez appears to lionize – attacked a sorority house and pedestrians in Santa Barbara, California,

---

[2] Sanchez refers to himself as an "In Real Life" or "IRL" streamer. He appears to "livestream" or "stream" content, meaning that he simultaneously records and broadcasts the videos online.

Case 1:21-cr-00269-CM   Document 46   Filed 03/30/22   Page 3 of 11

Page 3

with a knife, firearms (including a Glock semi-automatic pistol), and a vehicle, killing six and injuring 14 victims. *Id.* ¶ 10. Prior to the attack, Rodger posted an online video titled "Elliot Rodger's Retribution," and shared a written manifesto describing his grievance towards women and detailing a plan for their mass imprisonment and murder.

A selection of Sanchez's conduct during livestream videos during this time period, some of which he was arrested for, is set forth below.

On or about October 12, 2020, the defendant sprayed pepper spray on a male victim outside of a doughnut shop, after Sanchez had yelled at an employee of the doughnut shop and the victim, another customer waiting in line, confronted Sanchez.[3]

Around a week later, on or about October 20, 2020, the defendant sprayed pepper spray on an African American woman in Flatiron after the victim yelled at Sanchez, "I will mace you," "get that phone outta my face," and "enough is enough of this race shit you're promoting out here." After pepper spraying the victim, the defendant taunted her, yelling, "Congratulations. You just got maced" and "Call 9-1-1. Look at you. You just got owned, you retard. You're a retard. You slapped my phone, I'm just protecting my property. You fucking retard. Oh, it burns, right? Oh it burns? Yeah, pretty sure it does burn." The defendant was subsequently arrested, and the case was adjourned in contemplation of dismissal ("ACD") on or about January 21, 2021. The defendant was ordered to attend three sessions of a virtual program and comply with the requirement that he not be re-arrested for six months. *Id.* ¶¶ 28 & n.1.

Just two days after the incident described above, on or about October 22, 2020, the defendant climbed support beams on the Queensboro Bridge, approximately 80 feet above the pedestrian path. While on the support beam, the defendant stated, "so I got content spray," "hold on, let's see if it falls on anyone below" and then sprayed pepper spray toward individuals on the pedestrian path below. The defendant then said, "oh shit, oh shit, somebody got maced down there." Several NYPD officers had to ascend the structure to remove Sanchez. The defendant pled guilty to a disorderly conduct violation, in violation of New York State Penal Law ("NYPL") § 240.20, receiving a conditional discharge on or about January 21, 2021, which included a requirement that he stay arrest-free for six months.

Around a month after the incident described above, on or about November 21, 2020, the defendant sprayed pepper spray at a male employee of a pastry shop after the defendant harassed the employee and others for several minutes.

A few weeks later, on or about December 6, 2020, the defendant sprayed pepper spray in a male victim's face in Flatiron. The defendant walked up to the victim while filming and asked, "What is Santa getting you this, this uh Christmas?" When the victim responded, "Getting you away from me," the defendant said, "Why do you sound like a faggot? Are you Jewish? Are you Jewish? What's wrong with you?" The defendant then walked up to Sanchez, who sprayed pepper spray in the victim's face. The defendant yelled at the victim and taunted him repeatedly, stating,

---

[3] The defendant's conduct described herein was captured in his livestreamed videos, which the Government obtained as part of the investigation and produced in discovery.

"Your mother should have aborted you, fuck you." Sanchez then began running and talking about how the victim was calling the police, stating, "I ain't getting locked up today." When the defendant was arrested on or about December 16, 2020 as a result of this incident, he had pepper spray and a taser in his pocket. He was charged with possession of a weapon (for the pepper spray during the incident and a taser at the time of his arrest), assault, harassment, and unlawful possession of noxious material. *Id.* ¶¶ 32-33. He was released on bail, and the case is currently pending. *Id.*

On or about February 7, 2021, Sanchez followed two women down a street in Manhattan and yelled at them after they refused to give him their phone numbers, among other things, "Fuck you, you bitch. It's 'cause of you, it's 'cause of you that I'm a virgin – I have Incel rage." Sanchez also repeated multiple times that Elliot Rodger was a "good guy," Rodger's victims "deserved to be run over and hit by a truck" and "slaughtered," and Rodger "should have blown their brains out a long time ago." *Id.* ¶ 10.

### C. February 13, 2021 – Hoax Bomb Threat

On February 13, 2021, Sanchez livestreamed himself in lower Manhattan pointing a fake gun at a group of women and stating, "You talking to me?" He then discharged the fake gun, which contained a flag with the word "Bang" inscribed on it.

Just hours later on February 13, 2021, Sanchez made a bomb hoax threat near the enclosed outdoor seating area of a restaurant in the Flatiron district of Manhattan. *See* PSR ¶ 11. Sanchez recorded and posted a video of the incident to one of his YouTube accounts. *Id.*; *see also* Ex. A.[4] In the video, Sanchez walked up to two women inside the seating area while saying, "Let's enhance their meal." *Id.* He then loudly stated the following:

> Allahu Akbar. Allahu Akbar. Bomb detonation in two, in two minutes. I take you with me and I kill all you. I kill all you right now. And I kill all you for Allah. Fuck, fuck that shit. I'm gonna Allah. I'm gonna do it. I'm gonna fucking do it for Allah. I'm gonna do it, for, Allah, Allah, Allahu Akbar, Come on. I do it, bomb now, bomb now.

*Id.*

Approximately four people inside the seating area fled in fear. *Id.* The two women whom Sanchez stood beside gathered their belongings and went inside the restaurant. *Id.* After running away with another individual ("CC-1"), Sanchez stated, "Yo, all of them scattered," laughed, and then said, "Holy shit. Holy shit boys. That was fucking five stars. That was five stars. Holy shit, huh?" *Id.* A short time later, in discussing the bomb hoax, CC-1 stated, "Listen, you fucking people that run this world, you wanna troll us, we'll troll you back," to which Sanchez, seemingly elated, responded, "We're gonna fucking troll you" and "We do it. We do that fucking shit. We do that fucking shit." Ex. A.

---

[4] The Government is providing the Court and defense counsel with disks containing the video excerpt referenced herein as Exhibit A.

One of the victims ("Victim-1") called 9-1-1 after the incident, and NYPD officers responded to the scene. PSR ¶ 11. In subsequent interviews with the FBI's New York-based Joint Terrorism Task Force ("JTTF"), Victim-1 and Victim-1's friend ("Victim-2") explained, in substance and in part, that they had run for their lives, taking shelter in a different restaurant on a side street half a block away. *Id.* Both said, in substance and in part, that they had believed that Sanchez was a terrorist and was about to murder them. *Id.* A third victim ("Victim-3") interviewed by the JTTF who, like Victim-1 and Victim-2, had run away from Sanchez, also feared for her life.

### D.  March 20, 2021 – Continued Criminal Conduct

On or about March 20, 2021, the defendant harassed numerous people in and around an outdoor seating area on the street in lower Manhattan, while at certain points mimicking pointing a gun with his fingers on one hand and talking about "Glocks" and glorifying Elliot Rodger's killing spree. The defendant sprayed pepper spray on a passerby who attempted to get the defendant to stop. The defendant was arrested and charged with possession of a weapon, assault, harassment, criminal possession of a weapon. He was again bailed in the state system. The case is pending. *Id.* ¶ 34.

### E.  April 14, 2021 – Arrest for Hoax Bomb Threat and Search of Sanchez's Premises

On April 14, 2021, Sanchez was arrested based on a criminal Complaint for the February 13, 2021 hoax bomb threat described above. JTTF searched his apartment, pursuant to a search warrant, discovering, among other things, five magazines that fit a Glock firearm; an air soft gun; small rubber balls, possibly for the air soft gun; a paintball gun; paintball pellets; three canisters of pepper spray; a "practice only" spray canister; two pocket knives; as well as handwritten notes describing what appear to be ideas for livestreamed videos, including items like "dive and scream stop traffic" and "yell pop da Glock for Elliot," and what appear to be songs or poems promoting Incel ideology. *Id.* ¶ 12. These songs or poems include Incel references such as "Stacy's are a stain on earth . . . Don't blame me if I go ER and Burst" and "This is a W for the Incel army Stacy suck Chad dick." In Incel terminology, "going ER" is often used to state an intent to emulate Elliot Rodger by committing an attack; "Stacys" and "Chads" are archetypal females and males, respectively, who are very successful at gaining sexual and romantic attention; and Incels unsuccessfully compete against Chads for Stacys' attention.

## II. Procedural History

On April 12, 2021, Judge Ona T. Wang authorized a Complaint charging Sanchez with one count of false information and hoaxes, in violation of Title 18, United States Code, Sections 1038(a)(1) and 2, premised on violations of Title 18, United States Code, Sections 844(i) (malicious use of explosive materials) and 2332a(a) (use or threatened use of a weapon of mass destruction), in connection with the February 13, 2021 bomb hoax threat. As noted above, on April 14, 2021, Sanchez was arrested based on the Complaint. Sanchez was presented before Judge Wang, who ordered Sanchez detained on dangerousness and risk of flight grounds. On April 22, 2021, a Grand Jury sitting in the Southern District of New York returned an Indictment bringing the same charge as the Complaint. On April 29, 2021, Sanchez filed a motion for bail, and,

following a bail hearing before this Court on May 6, 2021, Sanchez was ordered released on certain conditions, including home detention with location monitoring, participation in mental health treatment as directed by Pretrial Services, and use of the internet restricted to communications with his lawyer, mental health counselor, and Pretrial Services. On May 7, 2021, Sanchez was released after his bond conditions were satisfied. On November 12, 2021, Sanchez pled guilty to the Indictment, without the benefit of a plea agreement. On February 10, 2022, the Court modified Sanchez's bail conditions by imposing a curfew.

### III. PSR, Probation's Recommendation, and Defendant's Submission

Both Probation and the Government calculate the applicable offense level as 10, the applicable criminal history category as II, and the resulting Guidelines Range as 8 to 14 months' imprisonment. The defendant also calculates the offense level as 10, but asserts that the applicable criminal history category is I, and the resulting Guidelines range is 6 to 12 months' imprisonment. The discrepancy concerns the defendant's disorderly conduct offense, in violation of NYPL § 240.20, for videotaping himself climbing and then spraying pepper spray off the Queensboro Bridge, for which he received a conditional discharge. As further discussed below, the Government and Probation consider this offense similar to the instant offense, *see* PSR ¶ 28 & n.1, such that it results in one criminal history point, pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(c)(1)(B).

Probation recommends a below-Guidelines sentence of time served (*i.e.*, 23 days' imprisonment), to be followed by three years' supervised release.

On March 23, 2022, Sanchez filed a sentencing submission, seeking time served and fewer than three years' supervised release based on the argument that this would delay his asserted plan to enlist in the military. Dkt. 45 ("Def. Sent. Sub.").

### IV. Discussion

**A. Applicable Law**

The Guidelines continue to provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C.

§ 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B)   to afford adequate deterrence to criminal conduct;
>   (C)   to protect the public from further crimes of the defendant; and
>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Defendant's January 21, 2021 Disorderly Conduct Conviction Is Similar to the Instant Offense

The Government respectfully submits that the defendant's January 20, 2021 conviction for disorderly conduct is "similar to" the instant offense, pursuant to U.S.S.G. § 4A1.2(c)(1)(B), and therefore receives one criminal history point, in accord with Probation's calculation in the PSR.

Because disorderly conduct is a violation, a conviction does not count toward a defendant's criminal history category unless, as relevant here, "the prior [listed] offense was similar to an instant offense." U.S.S.G. § 4A1.2(c)(1)(B). "Disorderly conduct" is a listed offense under this provision. *See id.*; *see also Santiago v. United States*, 13 Cr. 811 (ALC), 2018 WL 4440500, at *6 (S.D.N.Y. Sept. 17, 2018) (NYPL § 240.20, under which Sanchez was convicted, constitutes a listed offense under § 4A1.2(c)(1)).

As described above, the prior offense involved the defendant, while videorecording himself for his social media channels, climbing the Queensboro Bridge. While doing so, the defendant said to his followers, among other things, "so I got content spray," "hold on, let's see if it falls on anyone below" and then sprayed pepper spray toward individuals on the pedestrian path below, after which he said, "oh shit, oh shit, somebody got maced down there." This offense is similar to the charged conduct: like the charged conduct, the defendant livestreamed his conduct as a "stunt" and harassed innocent strangers. It was part of a continuing pattern of similar criminal conduct, as described above. Accordingly, the offense should receive one criminal history point.

### C. A Sentence Within the Guidelines Range Is Reasonable in This Case

The Government respectfully submits that a sentence within the Guidelines Range of 8 to 14 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing – principally the need to reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment; to protect the public from further crimes of the defendant; and to foster deterrence – and would appropriately take into account "the nature and circumstances of the offense and the history and characteristics of the defendant."

A sentence within the Guidelines Range would appropriately reflect the seriousness of Sanchez's conduct, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The defendant purposefully made innocent strangers believe that they were in the midst of a terrorist attack in Manhattan. Simply put, Sanchez's conduct was tailored to instill fear, and Sanchez, in fact, reacted with glee when he received his intended reaction, crowing for the camera, that "Yo, all of them scattered." This is because Sanchez appeared to derive enjoyment from these people's suffering and posted it online for other strangers' amusement. The distress suffered by these victims and the lasting effects of Sanchez's conduct, captured in the victims' own words to this Court, support imposing a custodial sentence within the Guidelines Range in order to provide just punishment for the harm this defendant has caused.

As detailed in the victim impact statements submitted to the Court, the defendant instilled genuine fear in his victims. Victim-3 described the incident as "disturbing and anxiety-inducing" for Victim-3 and her husband, and called to mind "the impact that terrorism had" on New York City. Ex. B at 4. Victim-1, who, with Victim-2, ran half a block away after Sanchez conveyed the threat, at first believed that Sanchez was really detonating a bomb, and then thought he was making a terrorist propaganda video. *Id.* at 6. Too afraid to return to New York and "convinced that a terrorist was operating in her neighborhood, ready to actually use violence at any given time," Victim-1 lived with her parents in another state for several weeks after the incident. *Id.* The incident has changed how Victim-1 goes about her everyday life – "[t]o this day," she is "uncomfortable in a crowded restaurant" and "carr[ies] mace with [her] everywhere [she] go[es]." *Id.* Victim-1 further explained that "[e]ven though this was not the act of terror [she] originally believed it to be, [she] still remained-and remain[s] to this day-afraid of the things that could have happened. Mr. Sanchez altered [her] faith in humanity and made [her] realize there are truly bad people out there who enjoy seeing others suffer." *Id.*

Both Victim-1 and Victim-3 spoke to the separate emotional harm caused by Sanchez not only perpetrating but also videorecording this awful moment in the victims' lives for his and others' enjoyment. Victim-3 wrote that "Filming me and other bystanders who felt that our lives were threatened to use for entertainment without consent is abhorrent." *Id.* at 4. She went on to say that she feels like her "privacy was invaded as well that day." *Id.* Victim-1 wrote the following:

> A few months later, when the FBI informed me and my friend that this was all a hoax, I was even more disheartened and scared. I was disgusted watching the video Mr. Sanchez recorded during the incident. As we ran away in complete fear, waiting to hear a bomb go off, he changes back to his natural voice and starts laughing that we "all scattered." It is our basic human right to live in this world believing that other people will not cause fear or laugh at our fear. . . . There are few things more disgusting and terrifying than making people fear for their own lives, and laughing at them in the process.

*Id.* at 6.

Both victims ask the Court to impose a sentence which would reflect the true gravity of the defendant's actions. Victim-3 wrote that she "hope[s] the consequences for this person are serious and it will deter other individuals for thinking they can leverage terrorism to harm individuals' psychological safety." *Id.* at 4. Victim-1 stated:

> I hope Mr. Sanchez receives the maximum sentence possible and learns how serious his actions are. I am afraid of him and other people like him. I was even too afraid to have my name shared with this statement because I never want him to find me and terrorize me further. He is an absolute menace to society, and I hope he understands the fear he imparted on me in this cruel hoax.

*Id.* at 6.

Just punishment in this case demands real consequences. The defendant's cruel conduct cannot be dismissed as a crime of immaturity or mere words. The experiences of these victims show that they suffered at the hands of this defendant. The general public also needs to know that terrorizing innocent people results in serious punishment. An incarceratory sentence is warranted to justly punish the defendant for inflicting such serious harm.

Further, Sanchez's was not a one-off, impulsive act. The nature and circumstances of the offense show that the defendant acted in a premeditated way, attempting to make his victims fear they were being targeted by a terrorist. Sanchez's YouTube accounts contain several videos mentioning bomb threats, suggesting that Sanchez had effectively been "workshopping" this destructive act for weeks. As an example, in a video around a month before the charged conduct, one of Sanchez's followers types a message containing a bomb threat during the livestream, which Sanchez broadcasts in real-time using the text-to-speech function; Sanchez then shouts "Allahu Akbar" repeatedly and laughs, running away soon after, as he states, in substance and in part, "in case some idiot calls the police on me." Around an hour later, Sanchez broadcasts a different statement from a follower using text-to-speech which includes, in substance and in part, "gas the kikes incels rise I have a bomb," to which Sanchez responds, in substance and in part, "Save that for when I go into stores to be honest, yeah save that for when I go into store, bro." Moreover, these were not random, misguided pranks – rather, his actions were in service of the extremist, violent, and reprehensible Incel ideology targeting women, as a self-professed Incel adherent. An incarceratory, Guidelines sentence is needed to promote respect for the law prohibiting such conduct, and to adequately deter Sanchez and others. *See* 18 U.S.C. § 3553(a)(2)(A)-(B).

The defendant's offense conduct demonstrates that he can inflict damage armed with even just a phone and an internet connection, and his criminal history reflects that he has inflicted physical damage with pepper spray on innocent victims on numerous occasions, all while proclaiming murderous Incel ideology. Sanchez's videos also make clear that the defendant is fixated on weapons. For example, as described above, on February 13, 2021, the defendant pointed a mock gun at a group of women, and on March 20, 2021, Sanchez mimicked pointing a gun with his fingers on one hand and talked about "Glocks," while glorifying Elliot Rodger's killing spree. Sanchez did, in fact, obtain magazines that fit a Glock firearm, which were recovered by law enforcement on February 13, 2021, from his residence. For all of these reasons, the Court should conclude that a Guidelines sentence is warranted to protect the public from the defendant.

Finally, a sentence within the Guidelines Range would take into account Sanchez's history and characteristics, and is necessary to afford adequate deterrence to Sanchez and others similarly situated. The defendant, though relatively young, has been a menace to the community for years – engaging in continuous, unabated harassment and criminal conduct, all while spouting destructive Incel ideology. Since 2018, the defendant has been arrested approximately seven times, five of

which spanned a six-month period preceding his instant arrest. Except for the instant case, for which he was detained for 23 days, the defendant has been given the benefit of the doubt – he has been bailed, and his cases have resolved with an ACD, a conditional discharge, or probation. However, throughout this time, despite court-imposed requirements to remain arrest-free, Sanchez has been utterly undeterred and has demonstrated complete lack of regard for the law. Imposing a penalty within the Guidelines Range is warranted to afford adequate deterrence in light of Sanchez's conduct and history.

The purported mitigating factors described in the defense's submission – the defendant's age, bullying in school, and difficulties imposed by isolation during the COVID-19 pandemic – do not explain or excuse the defendant's conduct, or warrant a downward variance, in light of the considerations discussed above. Scores of other people have dealt with similar issues, including the difficulties of the pandemic, without resorting to criminal conduct, much less a years-long spree of criminal conduct, and many have not had the benefit of the supportive family and opportunities Sanchez has been given, *see* PSR ¶¶ 37-43. Moreover, the defendant's criminal history, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, began well before the COVID-19 pandemic, such that the assertion at the core of the defendant's submission – that his conduct can be attributed at least in large part to isolation stemming from the pandemic – rings hollow. Sanchez's offense was serious, perpetrated without any reason other than to terrorize others, and hurt real people. Relatedly, the defendant's claim that punishment is not warranted because he did not violate his pretrial conditions while on release in this federal case – where he faces more severe potential consequences as compared to his state cases – is not a material mitigating factor here, especially considered in the face of his history of repeatedly and blatantly disregarding court orders and supervision for an extended period prior to this federal case. His troubling criminal record outweighs his conduct over the course of the past year. Moreover, compliance with pretrial release conditions is required of every defendant. *Cf. United States v. Mumuni Saleh*, 946 F.3d 97, 112 (2d Cir. 2019) ("[N]o substantially mitigating weight can be borne . . . by the fact that [a defendant] did what was plainly required of him – that is, behaving himself in prison. . . . [H]is compliance with institutional regulations has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a).")

Finally, and in accord with Probation's recommendation, the Government respectfully submits that a term of supervised release of three years is imperative, given this defendant's criminal history, to ensure that the defendant makes a successful transition into the community and does not revert to his history and pattern of criminal conduct. The defense's contention that a three-year term of supervised release would interfere with his supposed plan to join the military is not a basis for reducing an otherwise appropriate term of supervision. To the extent the defendant ultimately seeks to join the military, that is of course laudable, but the bare assertion in his sentencing submission that he is contemplating doing so does not constitute a basis for reducing the term of supervision that is plainly warranted based on his criminal conduct.

For the reasons explained above, the time-served sentence requested by the defendant is at odds with the facts and circumstances of this case and defendant. A more sustained period of incarceration, during which he could receive continued mental health treatment, and the maximum term of supervised release as recommended by Probation, is appropriate here.

## V. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines Range of 8 to 14 months is sufficient but not greater than necessary to meet the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:   */s/ Kaylan E. Lasky*
Kaylan E. Lasky
Assistant United States Attorney
(212) 637-2315
kaylan.lasky@usdoj.gov

cc:     Clay Kaminsky, Esq. (by ECF)