M46WsanS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        21 Cr. 269 (CM)

 5   MALIK SANCHEZ,
        a/k/a "Smooth Sanchez,"
 6
                 Defendant.
 7                                         Sentence
     ------------------------------x
 8
                                           New York, N.Y.
 9                                         April 6, 2022
                                           12:00 p.m.
10

11   Before:

12
                        HON. COLLEEN MCMAHON,
13
                                           District Judge
14
                             APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  KAYLAN E. LASKY
          Assistant United States Attorney
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for Defendant
20   BY:  CLAY H. KAMINSKY
          Assistant Federal Defender
21
     Also Present:  Special Agent Ryan Symons, FBI
22

23

24

25
```

M46WsanS

1          (Case called)

2          MS. LASKY:  Good afternoon, your Honor.  Kaylan Lasky

3    for the United States.  With me is Special Agent Ryan Symons

4    with the Federal Bureau of Investigation.

5          THE COURT:  Good afternoon, Ms. Lasky.

6          MR. KAMINSKY:  Good afternoon, your Honor.  Clay

7    Kaminsky from the Federal Defenders for Malik Sanchez.  Also

8    present today are his mother and several people from the Exalt

9    Youth program.

10          THE COURT:  Thank you.

11          This matter is on for sentencing under docket No. 21

12    Cr. 269, United States of America v. Malik Sanchez, Mr. Sanchez

13    having been found guilty by plea to one count of false

14    information and hoaxes, a class D felony, in violation of 18

15    U.S.C., Section 1038(a)(1).  This crime carries a statutory

16    maximum term of imprisonment of five years; a maximum term of

17    three years' supervised release; a maximum fine of $250,000;

18    and a $100 special assessment.

19          In connection with today's proceedings, I have

20    received and reviewed the presentence report, prepared by

21    United States Probation Officer Nichole Brown-Morin.  It was

22    filed with the Court on February 16, 2022.

23          I have a sentencing memorandum from the government,

24    dated March 30, 2022.  And on March 25, 2022, Wendy Olsen

25    Clancy, the victim witness coordinator, submitted two victim

M46WsanS

```
 1    impact statements in connection with this matter.

 2             I have a sentencing memorandum from the Federal

 3    Defenders of New York, dated March 23, 2022, together with

 4    exhibits A through M, which have been supplemented this morning

 5    with an exhibit N, which is a letter from something called

 6    Exalt Elevating Expectations for Youth, and an exhibit O, which

 7    is a letter from the Department of Education District 79

 8    Pathways to Graduation, indicating that Mr. Sanchez has

 9    achieved his GED.

10             I will attach that, Mr. Kaminsky, to your submission.

11             MR. KAMINSKY:  Thank you, your Honor.

12             THE COURT:  Is there anything else I should have

13    received in writing prior to today's proceedings?

14             From the government.

15             MS. LASKY:  No, your Honor.

16             THE COURT:  From the defendant.

17             MR. KAMINSKY:  No, your Honor.

18             THE COURT:  Has the government reviewed the

19    presentence report?

20             MS. LASKY:  Yes, your Honor.

21             THE COURT:  OK.  Any additions, deletions or

22    corrections, other than we have to talk about the guideline

23    calculation?

24             MS. LASKY:  No.

25             THE COURT:  Aside from that.
```

M46WsanS

1          MS. LASKY:  Aside from that, no, your Honor.

2          THE COURT:  OK.

3          Can we first talk about the guideline calculation, and

4    I'll hear the government.  I'd like to turn in my book to the

5    relevant section of the guidelines, whether a crime is similar

6    or not similar, and that section is somewhere in Mr. Kaminsky's

7    letter.  But I, of course, have been doing other things this

8    morning and not marking up Mr. Kaminsky's letter.

9          What section is that?

10         MR. KAMINSKY:  Your Honor, I believe it's 4A1.2, and I

11   believe I referred your Honor to the application notes.

12         THE COURT:  Correct.

13         MR. KAMINSKY:  12.

14         THE COURT:  4A1.2.  All right.

15         I would like the government to explain its position,

16   with citations to the sections and the application notes,

17   please.

18         MS. LASKY:  Yes, your Honor.

19         So, the government submits that -- well --

20         THE COURT:  It's a crime of disorderly conduct.  OK.

21         MS. LASKY:  Yes.

22         -- that the crime of disorderly conduct, your Honor,

23   is a prior offense that was similar to the instant offense.

24         THE COURT:  Right.  And similar how, with specific

25   citations to Section 4A1.2 and the application note.

M46WsanS

1          MS. LASKY:  So, as to the application note -- and my

2     apologies, your Honor.  I should have explained this in the --

3          THE COURT:  Yes, you should have.  But we're going to

4     talk about it now.

5          MS. LASKY:  In the submission.  But if you look at

6     their application note, your Honor --

7          THE COURT:  What application note?  Which one?

8          MS. LASKY:  Application note 12, the one that

9     Mr. Kaminsky referred to.

10          THE COURT:  OK.

11          MS. LASKY:  So, that application note concerns

12     subsection (c), but the language in it refers to determining

13     whether an unlisted offense is similar to an offense listed in

14     subsection (c)(1) or (c)(2).  The actual provision itself uses

15     the language "similar to" in two instances, your Honor.  So if

16     you look at (c)(1), it states that sentences for the following

17     prior offenses and offenses similar to --

18          THE COURT:  I'm sorry.  Where is (c)(1)?  There's no

19     (c)(1).  What are you talking about?

20          MS. LASKY:  4A1.2.

21          THE COURT:  4A1.2.  Let's go back.

22          MS. LASKY:  Subsection (c)(1).

23          THE COURT:  Subsection (c)(1), sentences for the

24     following prior offenses are counted only if --

25          MS. LASKY:  So, your Honor, I'm looking --

M46WsanS

1          THE COURT:  -- where the prior offense was similar to

2      an instant offense, and these are the offenses.

3          MS. LASKY:  So, your Honor, I'm looking at the first

4      sentence within that subsection.  It states that sentences for

5      the following prior offenses and offenses similar to them by

6      whatever name they are known are counted only if, and then --

7          THE COURT:  And in subdivision (B), the prior offense

8      was similar to an instant offense, and there's a list of prior

9      offenses, one of which is disorderly conduct or disturbing the

10     peace.

11         MS. LASKY:  Understood, your Honor.

12         THE COURT:  It's organized via common sense approach.

13     What are the facts?

14         MS. LASKY:  My point, your Honor, is that application

15     note 12, by its language, as I understand it, your Honor,

16     refers to the first "similar to" language within subsection

17     (c)(1) of 4A1.2.  In other words, it is used in order to

18     determine whether an unlisted offense is similar to a listed

19     offense.

20         Application note 12, however, does not appear to

21     address whether the prior offense was similar to an instant

22     offense.

23         THE COURT:  OK.  So you're saying, if I could rephrase

24     it, that because disorderly conduct is a listed offense under

25     4A1.2(c)(1)(B), because it is a listed offense, application

M46WsanS

1    note 12(A) isn't applicable.  Is that your argument?

2            MS. LASKY:  Yes, your Honor.  I couldn't have said it

3    better myself.

4            THE COURT:  OK.  Explain to me now why you consider

5    this prior conviction for disorderly conduct to be similar,

6    because I have to make a factual determination, to the crime

7    charged in this case.

8            MS. LASKY:  Thank you, your Honor.

9            So, putting aside application note 12 for the time

10   being, the government considers that offense to be similar

11   because of the nature of it and the --

12           THE COURT:  No, no.  Tell me what the facts were.

13           MS. LASKY:  Yes, your Honor.

14           THE COURT:  Tell me what the underlying facts were.

15           MS. LASKY:  So, in October of 2020, your Honor, the

16   defendant climbed the Queensboro Bridge while videotaping

17   himself, using a GoPro and posted it, live-streamed it to his

18   social media accounts, and during the course of that, your

19   Honor, the defendant stated comments such as I have my, quote,

20   content spray, at which time the defendant held up his canister

21   of Mace.  And then the defendant can be seen on the video

22   stating:  Hold on.  Let's see if it falls on anyone below, and

23   then sprayed the Mace down onto the population below.

24           This offense, your Honor, from the government's

25   perspective, is very similar to the charged offense, during

M46WsanS

1    which the defendant committed a stunt for the purpose of a

2    social media -- for his social media account, for his

3    followers, during which he is egged on and during which he

4    essentially does conduct in order to -- to -- to harass other

5    individuals, your Honor.

6              So it is essentially for the similarity to him doing

7    that to then going and making a bomb-threat hoax, your Honor,

8    similarly which was on video, which was for the purpose of

9    harassing strangers, your Honor, that the government submits

10   that these are similar.

11             THE COURT:  Thank you.  OK.

12             So hoax perpetrated against strangers.

13             MS. LASKY:  On video, your Honor.

14             THE COURT:  On video equals similar.  Right?

15             MS. LASKY:  Yes, your Honor.

16             THE COURT:  Fair summary?  I'm just trying to distill

17   it to the essence.

18             MS. LASKY:  Yes, your Honor.

19             THE COURT:  OK.

20             Mr. Kaminsky, I think the government has you with

21   respect to application note 12(A), which applies to an unlisted

22   offense.  Your client was convicted of disorderly conduct.

23   That's not an unlisted offense under Section 4A1.2(c)(1)(B).

24   It's not unlisted.  It's right there.

25             MR. KAMINSKY:  Correct, your Honor.

M46WsanS

1          Two thoughts on that.

2          THE COURT:  Sure.

3          MR. KAMINSKY:  The first is that the instant offense,

4     of course, is unlisted, so when you're comparing a listed

5     offense to an unlisted offense, including the instant offense.

6     And second of all, the guidelines in the commentary give no

7     other definition of "similar to" in this --

8          THE COURT:  Correct.  I'm supposed to use a common

9     sense approach.  So your position is the application note

10    applies because it's this offense that's the unlisted offense.

11         MR. KAMINSKY:  Right.

12         THE COURT:  There's no hoax, bomb threat, or anything

13    else listed in subsection (c)(1)(B).

14         MR. KAMINSKY:  Correct.

15         THE COURT:  OK.  So you concede that the government's

16    correct that disorderly conduct is a listed offense, but we

17    still have one listed offense and one unlisted offense.

18         MR. KAMINSKY:  Exactly.

19         THE COURT:  OK.

20         MR. KAMINSKY:  In addition, although there are some

21    similarities, if your Honor is not applying application note

22    12, although there are some --

23         THE COURT:  No, no.  You've made an argument, which

24    the government will respond to, but let's assume both ways:  If

25    I apply it; if I don't apply it.

M46WsanS

1      MR. KAMINSKY:  So, if you apply it, I believe none of

2   the factors class the same way.  One is a violation under New

3   York law.  The other is a federal felony.  The punishments are

4   vastly different.  The perceived seriousness is vastly

5   different.  The elements couldn't be more distinct, and the

6   level of culpability is different too.  So I think, if you

7   apply application note 12, they're just not similar.

8      If you don't apply application note 12, your Honor, of

9   course, there are similarities.  Mr. Sanchez was live-streaming

10  himself doing stunts.  These are two of the stunts that he

11  live-streamed himself doing, but that's where the similarities

12  end.  One of them is a bomb hoax at a restaurant.  The other is

13  climbing the Queensboro Bridge and using pepper spray.

14      I would say they're more different than they are

15  similar.

16      THE COURT:  Got it.

17      Does the government wish to address either

18  Mr. Kaminsky's argument that one of the two offenses -- that

19  being the offense of commission before this Court -- is an

20  unlisted offense and/or his argument under the application of

21  12(A)?

22      MS. LASKY:  Yes, your Honor.

23      With respect to 12(A), your Honor, I do think that the

24  defense's interpretation does strain the language in the

25  provision.  The provision, very, very clearly is speaking, by

M46WsanS

1      my reading at least, is speaking to whether the unlisted

2      offense is similar -- whether the unlisted offense has to do

3      with the --

4                THE COURT:  It's perfectly clear, when you read it,

5      that the listed offenses in (c)(1)(B) are -- the prior offense

6      was similar to an instant offense.  OK?

7                MS. LASKY:  Yes, your Honor.

8                I mean, your Honor, by my reading, I do think that the

9      application note and the case law also supports that this is

10     really about determining whether we're talking about a prior

11     offense, your Honor.

12               THE COURT:  OK.  We agree that the current offense is

13     an unlisted offense.

14               MS. LASKY:  Yes, your Honor.

15               THE COURT:  OK.  We all agree about that.

16               You say there is authority.  There are cases I can

17     read, hopefully, where a court of appeal has said that the term

18     "unlisted offense" in application note 12(A) refers only to the

19     prior offense.  Where is that authority?

20               MS. LASKY:  Your Honor, the only authority I found on

21     this was not as satisfactory as I would like.

22               THE COURT:  So there is no authority.

23               MS. LASKY:  There is authority, your Honor.

24               So, in the Second Circuit, there's been a case from

25     1999 in which they did acknowledge --

M46WsanS

| | |
|---|---|
| 1 | THE COURT:  OK.  What's the name of the case?  Hand it |
| 2 | up to me.  I'd like to read it. |
| 3 | MS. LASKY:  Yes, your Honor. |
| 4 | THE COURT:  You didn't bother to put this in your |
| 5 | memorandum. |
| 6 | MS. LASKY:  So, your Honor, this is *United States v.* |
| 7 | *Martinez-Santos*.  It's 184 F.3d 196, your Honor. |
| 8 | THE COURT:  Well, we'll have to print it out. |
| 9 | MS. LASKY:  The case does, your Honor -- so, it's |
| 10 | addressed in a footnote. |
| 11 | THE COURT:  Oh, good.  A footnote. |
| 12 | MS. LASKY:  Yes, your Honor. |
| 13 | THE COURT:  Second Circuit authority doesn't count if |
| 14 | it's in a footnote.  Don't you know that's what the Second |
| 15 | Circuit says? |
| 16 | MS. LASKY:  Well, your Honor, that's why I was about |
| 17 | to say it also states that the court may look to the |
| 18 | multifactor test, which is essentially what the court, as I |
| 19 | understand it, is doing here. |
| 20 | THE COURT:  I'm trying to decide whether to look to |
| 21 | it. |
| 22 | MS. LASKY:  Yes, your Honor. |
| 23 | THE COURT:  I'm trying to decide how to interpret |
| 24 | this.  But let's go to the multifactor test while we print this |
| 25 | out. |

M46WsanS

```
 1                MS. LASKY:  Yes, your Honor.
 2                THE COURT:  The punishment for disorderly conduct,
 3     which I think is a B misdemeanor, A misdemeanor --
 4                MR. KAMINSKY:  Not even a misdemeanor.
 5                THE COURT:  Not even.  It's a violation.
 6                MS. LASKY:  Yes, your Honor.
 7                THE COURT:  OK.
 8                And the crime here carries a statutory maximum
 9     sentence of five years' imprisonment, so there's no similarity
10     between the punishments imposed for the listed and unlisted
11     offenses.  The perceived seriousness of the offense is
12     indicated by the level of punishment.  The perceived
13     seriousness of disorderly conduct is obviously significantly
14     less than the perceived seriousness of making a false bomb
15     threat if you look at it by the level of punishment.
16                I think you can concede that the elements of the two
17     offenses are in no way alike.
18                MS. LASKY:  Agreed, your Honor.
19                THE COURT:  OK.
20                His level of culpability is identical.  He's the
21     perpetrator in both instances.  And the degree to which the
22     commission of the offense indicates a likelihood of recurring
23     conduct, recurring criminal conduct.  I don't even know what
24     that means, let alone how one would apply it.
25                MS. LASKY:  Yes, your Honor.
```

M46WsanS

1              My understanding as well, your Honor, is that this is

2     not meant to be a limiting list of factors.

3              THE COURT:  No.  The Court is meant to use your common

4     sense.

5              MS. LASKY:  Yes, your Honor.

6              THE COURT:  I'm going to use my common sense.  All

7     right?  My common sense tells me that making a bomb threat in a

8     restaurant is so qualitatively different from a disorderly

9     conduct violation under the New York State penal code, even if

10    you videotaped yourself doing both and are under the misguided

11    impression that these are the kinds of things that should be

12    performed on videotape for the viewing public, that they are

13    not similar offenses, which makes a whopping two months' worth

14    of difference on the guidelines.

15             OK.  This is a case in which -- I'm reading the

16    footnote -- there was little similarity between his five-day

17    sentence for fare beating and his seven-day sentence for

18    transfer scalping and the instant offense of illegal reentry

19    after deportation.  Right?

20             MS. LASKY:  Correct, your Honor.

21             THE COURT:  That's the result in the case.

22             MS. LASKY:  Correct, your Honor.

23             THE COURT:  Fine.  I'm going to go with the

24    defendant's guideline calculation.

25             OK.  Does the government wish to be heard on

M46WsanS

1    sentencing?

2         MS. LASKY:  Yes, your Honor.

3         So, the government here respectfully requests that the

4    Court impose a sentence within the guideline range here.

5         In short, Mr. Sanchez's crime was disturbing and had

6    real effects on his victims.  He's been a menace to the

7    community for years, all while spouting Incel ideology, and

8    accordingly, a custodial sentence, we respectfully submit, is

9    called for here.

10        First, a guidelines sentence would reflect the

11   seriousness of the offense, promote respect for the law and

12   provide just punishment.  I'd like to focus on the conduct

13   itself first, your Honor, which I understand that the Court has

14   reviewed the clip in connection with the bail.

15        THE COURT:  Deeply, deeply disturbing.

16        MS. LASKY:  OK, your Honor.

17        So, I won't belabor it, your Honor, but in the

18   defendant's own words, he spoke about a bomb detonation.  He

19   said he was going to kill all you, I'm going to do it, I'm

20   going to bomb now, bomb now.  You see certain diners run away,

21   and you see Mr. Sanchez bragging afterwards:  Yo, all of them

22   scattered, etc.

23        The victim impact statements that are before the

24   Court, I believe, speak to different kinds of harms that the

25   victims have suffered here.  One is that they, of course, in

M46WsanS

| | |
|---|---|
| 1 | the moment, feared for their lives.  One of the victims who was |
| 2 | with her friend reported running halfway down the block.  She |
| 3 | actually moved in with her parents for several weeks after the |
| 4 | event because she thought that a terrorist was on the loose in |
| 5 | her neighborhood.  And she said that she continues to feel the |
| 6 | effects of this incident to this day. |
| 7 | THE COURT:  And I have no doubt that is true. |
| 8 | MS. LASKY:  Another type of harm suffered here, your |
| 9 | Honor, has to do with the fact that the defendant was posting |
| 10 | this online and was doing so for his and others' own amusement. |
| 11 | As victim three wrote to the Court, your Honor, she |
| 12 | said that me and other bystanders felt that our lives were |
| 13 | threatened for entertainment, without consent.  She wrote that |
| 14 | that felt abhorrent and that her privacy was also invaded that |
| 15 | day. |
| 16 | Mr. Sanchez's conduct was very serious, and his |
| 17 | conduct had real effects on real victims, and the government |
| 18 | believes that the public should know that terrorizing innocent |
| 19 | people results in serious punishment. |
| 20 | Additionally, your Honor, and as the government put in |
| 21 | its submission, this was not just a one-off, rash kind of |
| 22 | action.  It appeared that the defendant was actually |
| 23 | workshopping this kind of conduct.  There were other videos in |
| 24 | which the defendant stated things like -- about bomb threats or |
| 25 | in which his followers were making statements that he was |

M46WsanS

1    playing off of with respect to bomb threats, your Honor.

2              Second, your Honor, a guideline sentence is necessary

3    to protect the public from the defendant.  The conduct was

4    serious in and of itself and harmful in and of itself, but I

5    think particularly viewed within the lens of -- through the

6    lens of this defendant and his fixation with guns, the fact

7    that he was found with five magazines in his apartment after --

8              THE COURT:  What am I supposed to do about his

9    subsequent rehabilitation?  That's what's important for

10   protecting the public.

11             MS. LASKY:  Understood, your Honor, and I think, of

12   course, that if Mr. Sanchez is making strides, of course,

13   that's extremely laudable, important for him and important for

14   the community, your Honor.

15             However, I would state, your Honor, that he

16   essentially had been doing this kind of conduct for years.

17   Excuses that I understand the defendant to be making for his

18   conduct ring hollow to some extent, your Honor, as far as, for

19   example, the bullying and the effects of the COVID-19 pandemic.

20   And your Honor, this is the first time that the defendant has

21   been under the threat of a serious federal sentence of this

22   nature, your Honor.  He's never been charged federally.

23             THE COURT:  Right.  Their theory is that he's been

24   scared straight.

25             MS. LASKY:  Right, your Honor, but he certainly has

M46WsanS

1    come before courts before.  He has been sentenced to probation,

2    to ACD, and similar kinds of resolutions, and yet he has

3    continued undeterred to do these kind of harmful acts for the

4    community and to be a menace to the community.

5         That he has stopped doing so now for, admittedly,

6    eight or nine months, I believe, because he is under a serious,

7    lengthy potential sentence, I don't think speaks to the

8    defendant's rehabilitation to the extent that the defense

9    contends that it does, your Honor.

10        Your Honor, the other thing, I believe, and I was

11   noting this to some extent, is about the defendant's criminal

12   history here.

13        The government laid out in lengthy detail the

14   defendant's criminal history, which predated the COVID-19

15   pandemic, beginning with an armed -- or excuse me, a robbery in

16   which he held up a pretend gun several years ago and spanning

17   until he was arrested on these federal charges.  He's been

18   arrested approximately seven times, five times during the six

19   months preceding his federal arrest.  He's been given the

20   benefit of the doubt time and time again.  His cases have

21   resolved without incarceratory sentences, and yet Mr. Sanchez

22   has remained undeterred.  It's clear that those repeated

23   previous brushes with the law have not deterred him.

24        Your Honor, I would also like to note here that the

25   defendant's request for a limited term of supervised,

M46WsanS

1    supervision is particularly troubling to the government in

2    light of the defendant's criminal history.

3          THE COURT:  What do you mean, his request for a

4    limited term of supervision?

5          MS. LASKY:  Yes, a limited term, less than the maximum

6    term of supervised release is troubling to the government.

7          In light of the defendant's criminal history, I

8    believe that this defendant is a candidate for the maximum term

9    of supervised release.  He could benefit certainly from having

10   supervision, as could the community, your Honor.  And it's for

11   those reasons, your Honor, that the government respectfully

12   submits a guidelines sentence.

13         I would also note, your Honor, as to zone B, of

14   course, the Court may consider whatever sentence it believes is

15   appropriate here.  The defense asks that because the defendant

16   served 23 days, which is nearly one month, that it would be

17   appropriate here to fashion a sentence that does not solely

18   consist of imprisonment here.

19         Your Honor, I would point the Court here to

20   application note 4 of subsection -- or, excuse me, of

21   guidelines provision 5C1.1(c).

22         THE COURT:  Uh-huh.

23         MS. LASKY:  And this is the application note that is

24   interpreting this provision.  It states that if a defendant is

25   a nonviolent first offender in the zone B range, then the Court

M46WsanS

1    should consider imposing a sentence other than imprisonment, in

2    accordance with subsection (b) or (c)(3), which is at issue

3    here, and it goes on to define a nonviolent first offender as a

4    defendant who has no prior convictions or other comparable

5    judicial dispositions of any kind and who did not use a

6    credible threat of violence, for example.

7         The defendant plainly does not meet the definition of

8    a nonviolent first offender, by the government's view.  Of

9    course, the Court may do whatever the Court wishes to do in

10   this respect, but I would state that I do not believe that the

11   defendant's proposed sentence here would be appropriate, your

12   Honor.

13        THE COURT:  Give me one minute.

14        OK.  Mr. Kaminsky, have you reviewed the presentence

15   report and gone over it with your client?

16        MR. KAMINSKY:  Yes, Judge.

17        THE COURT:  I think you're right about the calculation

18   of the guideline.  I think the government's probably right

19   about 5C1.1, but I'll hear you on sentencing and on anything

20   that you choose to address.

21        MR. KAMINSKY:  Thank you, your Honor.

22        On 5C1.1, I hadn't had the opportunity to review that

23   before today.  I would just note that it's about what, in the

24   commission's view, the Court should consider.  It doesn't limit

25   the Court's ability.

M46WsanS

1          THE COURT:  Correct.  My ability.  I can consider

2     anything I want, and for example, what would be my options?  In

3     your view, what would be my options?  Forget about what you

4     want.  What would be my options, other than a sentence of X

5     number of months of imprisonment.  A guidelines sentence -- six

6     to 12 is the guidelines.

7          MR. KAMINSKY:  I guess I'd ask your Honor to bear in

8     mind --

9          THE COURT:  Take me to law school.  What are my

10     options?

11          MR. KAMINSKY:  Your Honor can sentence Malik to up to

12     five years in prison.

13          Sorry, your Honor.

14          THE COURT:  If I was going to give a guidelines

15     sentence, can I put him on home confinement?  Can I put him on

16     intermittent sentencing?  Where in here are there options for

17     me?

18          MR. KAMINSKY:  If you were going to give a guidelines

19     sentence, it would be under 5C1.1.  And under 5C1.1(c), you're

20     in zone B of the guidelines table.

21          THE COURT:  Right.

22          MR. KAMINSKY:  And it says the minimum term may be

23     satisfied by, and that's not limited by --

24          THE COURT:  I understand.

25          MR. KAMINSKY:  -- the application note, which just

M46WsanS

1    talks about consideration, may be satisfied by a sentence of

2    imprisonment.  Sure.  A sentence of imprisonment that includes

3    a term of supervised release with the conditions of substitute

4    community confinement or home detention, provided that at least

5    one month is satisfied by imprisonment; or (c) a sentence of

6    probation that includes a condition of intermittent

7    confinement.

8          So, your Honor, under 5C1.1(c)(2), a guidelines

9    sentence in this case is one month of imprisonment and four --

10   I'm sorry, and five months of home detention.

11         Mr. Sanchez has already served 23 days of

12   imprisonment, nearly one month, and nine months of home

13   detention under very strict conditions that your Honor likened,

14   correctly, when your Honor set bail to like being imprisoned at

15   home.

16         So he's done nine months of that.  He's also done

17   three months on a curfew.  So he has, in my view, completed a

18   guidelines sentence.

19         Of course, your Honor's not bound by the guidelines at

20   all and can fashion an appropriate sentence under 3553(a).  And

21   there, of course, the question is what sentence is sufficient

22   but not greater than necessary to achieve the purposes of

23   sentencing?

24         There --

25         Shall I continue, your Honor?

M46WsanS

1          THE COURT:  Oh, I'm listening.

2          MR. KAMINSKY:  There, your Honor, I think, should

3   consider -- I won't belabor the points that we made in our

4   letter, but Malik was 19 years old when he committed this

5   offense and even younger when he committed the other things

6   that the government talks about.

7          I'm not sure how appropriate it is to talk about a

8   robbery that was a sealed juvenile adjudication for grand

9   larceny, not for robbery.  But in any event, when he committed

10  this offense, he was 19 years old, and the Supreme Court has

11  time and time again recognized that youth is important.  It's

12  more than just a chronological fact.  Youth is important

13  because it bespeaks immaturity, which lessens culpability, and

14  suggests that less punishment is in order, but also because it

15  talks about a capacity for change.  Right?  Young people have a

16  greater capacity for change.

17         And your Honor, we talked about it in our memo.  It's

18  in the letters.  I can say personally Malik has changed over

19  the past year -- it's been almost a year -- before my very

20  eyes; when I first met Malik, he was, as you might expect, from

21  the person who is in those videos.  And now he's just brimming

22  with hope and goodwill, and he's a really warm, engaged young

23  man who has a lot of hope for the future.  He has a lot of

24  different ideas about what he wants to do.

25         He was just invited by Exalt, and they're here to

M46WsanS

1  support him, to apply for a $20,000 scholarship to further his

2  education.  He has been previously thinking of joining the

3  military and then using the GI bill money after that to further

4  his education.

5       He has a lot of potential, and both OBT, the program

6  that helped him get his GED, which he completed in February,

7  and Exalt, which has provided for the job training, you know,

8  they love him at both places and they love him because he is

9  good to the other people there.  He's kind, he's engaged, he's

10  optimistic, and he's a hard worker.

11       One of the four purposes of sentencing is

12  rehabilitation, and Malik has been rehabilitated.  He's also

13  been punished, never went to jail before.  He was in a federal

14  lock-up during the pandemic for three weeks -- actually, it

15  was -- sorry -- Essex County, which is no better, your Honor.

16       THE COURT:  No.

17       MR. KAMINSKY:  -- for more than three weeks, and he's

18  clearly been deterred as well.

19       So I'm not really sure what purpose would be served by

20  putting him back in jail for a guidelines sentence.  It would

21  certainly mess up all the progress that he's made, but what

22  would be the hope.  What would the Court hope to achieve in

23  doing that?  Certainly, it could hope to achieve no better than

24  it's achieved through the bail conditions in this case and

25  through Malik's own hard work.

M46WsanS

1          I think that when your Honor considers the parsimony

2     clause of 3553(a), it's pretty clear that returning Malik to

3     the custody would not be a parsimonious sentence.

4          In terms of the fine and the supervision, we would ask

5     that your Honor not impose a fine because he doesn't have the

6     ability to pay a fine.

7          THE COURT:  I don't know where that came from.

8          MR. KAMINSKY:  That was probation's idea, your Honor.

9     I don't think the government even asked for it.

10          And any money that he or his family does have should

11     go to his education, in my view.

12          And in terms of the three-year term of supervised

13     release, your Honor has the ability to impose that.  The

14     guidelines are one to three years.  We had felt that the

15     shorter term might be appropriate because Malik won't be able

16     to go into the military while he's on supervision.  That was

17     the whole thinking behind that, your Honor.

18          THE COURT:  OK.  Is that it for you, Mr. Kaminsky?

19          MR. KAMINSKY:  Unless the Court has questions.

20          THE COURT:  No.  And thank you for your very fulsome

21     submission and all those letters.

22          MR. KAMINSKY:  Thank you, your Honor.

23          THE COURT:  Anything else from the government?

24          MS. LASKY:  No, your Honor.

25          THE COURT:  OK.

M46WsanS

1           Let me ask.  Are any of the victims here?

2           MS. LASKY:  No, your Honor.  They did not feel

3    comfortable.

4           THE COURT:  OK.  I want to make it really clear that I

5    read their letters; that I've been at the wrong end of the gun,

6    so I can appreciate what it's like to be in a life-threatening

7    or what can reasonably be perceived to be a life-threatening

8    situation.  I believe every word that these women said.  They

9    were terrified, and they suffer to this day.  It's just very,

10   very disturbing to me.

11          Mr. Sanchez, is there anything you want to say to me

12   before I sentence you?

13          You can take your mask off.

14          THE DEFENDANT:  Yes, your Honor.

15          First and foremost, I would like to apologize and

16   basically apologize for all the fear that I put into those

17   women that day.  And furthermore, I would like to also say that

18   I feel that I should thank you, because the behavior that I was

19   displaying was that of a -- that of an immature and reckless

20   child.

21          THE COURT:  It was that of a sicko.

22          THE DEFENDANT:  It was, correct.  Correct, ma'am.

23          And I would like to thank you for giving me the

24   opportunity, when you didn't have to, to turn my life around

25   through this rehabilitation.  And once again, to the victims,

M46WsanS

1    I'm sorry.  And I've -- I've managed to gather up the courage

2    and -- gather up the courage and honor to pursue something that

3    I shouldn't endanger people, I shouldn't put fear in people,

4    and I should keep moving forward in my life as a young and

5    aspiring young man.  And this is definitely helping me with

6    that.  And I would never consider doing these actions again.

7    And I take full accountability, ma'am.

8            Thank you.

9            THE COURT:  OK.  Have a seat.

10           I'm just going to say that this is a hard case.  It's

11   a hard case because of those two letters.  It's a hard case

12   because I have to make a decision, knowing that two people's

13   lives have been impacted, that two human beings have been

14   traumatized, and that there is literally no way to undo that.

15   I hope and I pray that, with time, they will be able to come to

16   terms with what happened to them that day.  But I know for a

17   fact that they'll never forget it and that there will be a

18   moment sometime in their future, when they least expect it,

19   when it will surface and bite them in the butt.  I know because

20   it's happened to me.  And that makes it really hard to kind of

21   let you start out with a clean slate based on what you've done

22   over the course of the last year.

23           But for the really terrifying nature of what it was

24   that you did, the first line of Mr. Kaminsky's sentencing

25   memorandum is exactly correct:  "This is a pretrial success

M46WsanS

1    story."  This is a young man who was well down a very, very,

2    very well trodden road of petty but increasingly serious

3    criminal activity, at a very young age, who managed to do

4    something that was serious enough that caused him to go federal

5    at the age of 19, at which point he was put, during the middle

6    of the Covid epidemic, into a correctional facility.  That is

7    not a pleasant place, and he saw for himself what lay ahead,

8    and he was fortunate to have the Federal Defenders of New York

9    assigned to defend him, with their amazing dedication to their

10   clients and the resources that they put especially toward young

11   offenders, and something seems to have scared him straight,

12   because your actions over the course of the last year,

13   Mr. Sanchez, have been both unexpected in light of your prior

14   record and pretty remarkable.

15          I don't know what got you started down the path of

16   doing stupid, reckless, ultimately self-destructive things.  It

17   certainly wasn't your family.  But whatever it was, to the

18   extent that the purpose of sentencing is to effectuate the

19   defendant's rehabilitation, it appears to me that the prospect

20   of sentencing has gone a long way toward doing that.

21          What you did was a terrible thing and what you've done

22   in the past, not necessarily so terrible, but stupid, immature,

23   and criminal, would ordinarily cause me, under guideline

24   provision 5C1.1(c), which is grade B, to put you in for a month

25   and put you on five months of home confinement.

M46WsanS

1          Mr. Kaminsky's right.  Having done 23 of those 30

2     days, it doesn't make a whole lot of sense to me to put you in

3     for a week.  I think no purpose of sentencing would be served

4     by doing that.

5          So what I'm going to do is to sentence you to a term

6     of three years' supervised release.  I'm sorry.  It has to be

7     the maximum term of supervised release.  It has to be.  The

8     military, if it will take you in light of your criminal record,

9     will still be there in three years.  Indeed, it is possible

10    that if things work out, probation might apply for an early

11    termination of your supervision.  Might.  That will depend a

12    lot on you.  But I think a sentence of time served and three

13    years' supervised release, which is the sentence that the

14    probation department recommends to me, out of its vast

15    experience dealing with all manner of offenders, is, in the

16    end, the right sentence because it's the sentence that you

17    earned by your behavior over the course of the last year.

18         It's also a sentence I'm perfectly prepared to undo if

19    at any point during those three years you should do anything

20    else that's stupid or reckless or criminal.

21         For the three years that you're on supervised release,

22    you're going to have to report to a probation officer on a

23    regular basis.  And you have to do everything the probation

24    officer tells you to do, and you can't do anything the

25    probation officer tells you not to do.

M46WsanS

1          What does that mean?

2          It means you can't commit another crime, federal,

3     state or local felony, misdemeanor, violation.  I don't care

4     how serious or trivial it seems, you can't commit another

5     crime.

6          You can't get involved with controlled substances.

7          You're going to have to give a sample of your DNA,

8     your genetic identifying material, to the probation department.

9     It's going to be in criminal databases for the rest of your

10    life.

11         You have to get a job, at least 30 hours a week,

12    unless the probation officer excuses you from working.

13    Schooling, training, that's one excuse for not working, really

14    about the only one that I think matters.  And it's not a

15    question of getting a job that you'd like to have.  It's a

16    question of getting a job that you can get.  But I've seen

17    references in these materials to training programs, and I

18    encourage you, as I know your probation officer will encourage

19    you, to take advantage of those programs, to get yourself more

20    training, to get yourself more education.

21         You must submit to one drug testing within 15 days of

22    today's date and at least two periodic drug tests thereafter,

23    as determined by the Court.

24         I notice that probation believes you pose a low risk

25    of future substance abuse, but you're young, and there are lots

M46WsanS

1    of temptations out there.  And I just want you to understand

2    that someone will be looking over your shoulder.

3            You have to report to the probation office in this

4    courthouse within 72 hours.  You can probably do that this

5    afternoon with Mr. Kaminsky, I would imagine.  You will be

6    assigned a probation officer.

7            You can't knowingly leave the federal judicial

8    district where you're authorized to reside without getting

9    permission of your probation officer.  Your address is in the

10   Southern District of New York, and that's where you're

11   authorized to reside.  But that means you can't go to Brooklyn

12   without the permission of your probation officer or to Queens

13   without the permission of your probation officer or to New

14   Jersey without the permission of your probation officer.

15           And I know Mr. Kaminsky walked in when I was

16   sentencing someone this morning for going to Brooklyn without

17   the permission of his probation officer.  So don't think it

18   won't happen.

19           Mr. Kaminsky.

20           MR. KAMINSKY:  Your Honor, just until the probation

21   officer is assigned, can we grandfather in his going to OBT in

22   Brooklyn?

23           THE COURT:  Oh, if OBT is in Brooklyn, then we have to

24   grandfather that in.

25           MR. KAMINSKY:  Thank you, your Honor.

M46WsanS

| | |
|---|---|
| 1 | THE COURT:  Absolutely.  If there are any programs |
| 2 | that he's currently involved in that are in the Eastern |
| 3 | District of New York, then he is authorized to go to those |
| 4 | programs. |
| 5 | MR. KAMINSKY:  Thank you, your Honor. |
| 6 | THE COURT:  I'm sure your probation officer will give |
| 7 | you permission to go to those programs, but you have to ask. |
| 8 | That was the problem with the guy this morning.  He wanted to |
| 9 | go someplace, and he didn't ask.  You, for the next three |
| 10 | years, have to ask. |
| 11 | You have to answer truthfully the questions that your |
| 12 | probation officer asks you, truthfully and completely.  The |
| 13 | fellow I sentenced this morning, he didn't tell his probation |
| 14 | officer everything he was supposed to.  He got sentenced for |
| 15 | that too, and he went to jail for that. |
| 16 | You have to live at a place that's approved by your |
| 17 | probation officer, and if you're going to change where you live |
| 18 | or anything about your living arrangement, including the people |
| 19 | that you live with, you need to clear it with your probation |
| 20 | officer before you make the change.  You have to ask. |
| 21 | And if there's an emergency, there's a fire in the |
| 22 | building next door, everybody's evacuated from your building, |
| 23 | the fire department says you can't go in, you need to call your |
| 24 | probation officer within 72 hours and say:  This is what |
| 25 | happened; this is why I'm not in the place where you think I'm |

M46WsanS

1    supposed to be.

2            You have to allow the probation officer to visit you

3    at any time -- in your home or anywhere else -- and to take any

4    items that are prohibited by the conditions of your supervision

5    that are observed in plain view, like if there were a gun or

6    drugs or any kind of contraband; the probation officer could

7    pick it up and take it away.

8            As I said, you have to work full time at a lawful type

9    of employment unless you're excused from doing so, and if you

10   don't have full-time employment, you have to try to find it.

11           If you're going to change where you work or anything

12   about your work, you have to tell your probation officer in

13   advance.  You have to ask permission.

14           However, if you're working in a store and they close

15   the store so that you're not working there anymore, because

16   nobody's working there, you need to tell the probation officer

17   right away, within 72 hours.

18           You can't communicate or interact with anyone who you

19   know is engaged in criminal activity.  And if you know someone

20   who has been convicted of a felony, like you have, you can't

21   knowingly communicate or interact with that person unless you

22   get permission from the probation officer.  You have to ask.

23           If any law enforcement officer questions you, you have

24   to notify the probation officer within 72 hours:  The cops

25   stopped me and asked me blah, blah, and let me go.  You have to

M46WsanS

1    tell the probation officer.

2           You must not own, possess, or have access to a

3    firearm, ammunition, any kind of destructive device or

4    dangerous weapon.

5           You must not act, or make any agreement with a law

6    enforcement agency to act, as a confidential human source or

7    informant without getting the permission of the Court -- not

8    even the probation officer.  Me.

9           In general, you must follow all of the instructions of

10   your probation officer, and they will include the following

11   special conditions:

12          You have to participate in an outpatient mental health

13   treatment program that's approved by your probation officer.

14          And you have to continue to take any medications that

15   are prescribed by your treatment provider.

16          You have to contribute to the cost of those services

17   based on your ability to pay or the availability of insurance

18   that might cover it.

19          I authorize the release of available psychological and

20   psychiatric evaluations and reports, including the presentence

21   investigation report, to your healthcare provider.

22          You have to participate in what's called cognitive

23   behavioral treatment under the guidance and supervision of your

24   probation officer for as long as the probation officer thinks

25   you need that, up to the full three years of your term.  The

M46WsanS

1    probation officer can release you early from that, but that's

2    for the probation officer to decide.

3            Now, because of the nature of the crime that you

4    committed, you have to permit the probation officer to install

5    an application or software that allows it -- allows

6    probation -- to survey and/or monitor all activity on any

7    computer service or connected device that you are going to use

8    during the term of your supervision or that can access the

9    internet.

10           The fellow who was here this morning didn't tell his

11   probation officer that he was using a computer at work.  That

12   counts.  He's doing some jail time as a result.

13           The probation office is authorized to install such

14   applications or software.  Tampering with or trying to

15   circumvent probation's monitoring capabilities is prohibited.

16           The fellow this morning was interested in software

17   that would interfere with monitoring activity.  That did not go

18   well for him.

19           To ensure you're compliant with the

20   computer-monitoring condition, you have to allow the probation

21   officer to conduct initial and periodic unannounced

22   examinations of any devices that are subject to monitoring.

23   You have to tell other people who use the devices that it's

24   subject to examination.  So if you share a computer with other

25   people in your home, they need to know that probation might see

M46WsanS

1    something they're doing on the computer.

2              You have to provide to probation advance notification

3    of planned use of any devices, and you won't use any devices

4    without approval until their compatibility is determined and

5    installation is completed.  Applications for your devices shall

6    be approved by the probation office once the probation office

7    ensures compatibility with the surveillance-monitoring

8    applications or software.

9              Websites, chatrooms, messaging and social-networking

10   sites shall be accessed via the device's web browser as opposed

11   to an app, unless otherwise authorized.

12             You will not create or access any internet service

13   provider account or other online service using someone else's

14   account, name, designation, or alias.

15             You will not utilize any peer to peer and/or

16   file-sharing applications without the prior approval of your

17   probation officer.

18             The use of any devices in the course of your

19   employment will be subject to monitoring or restrictions, as

20   permitted by the employer.

21             When you think about it, that's quite a punishment for

22   a young man of 20.  But hopefully, it will keep you off the

23   kind of sites that got you into this pickle in the first place.

24   Just remember it's for your benefit.

25             MS. LASKY:  If I may, your Honor?

M46WsanS

1          For clarity, the prohibition against using weapons and

2     ammunition, etc., your Honor, given the defendant's history,

3     again, just for clarity, does that include magazines as well as

4     pepper spray, your Honor?

5          THE COURT:  It includes a firearm, which is a gun;

6     ammunition, which would include a magazine; a destructive

7     device or a dangerous weapon.  I don't believe pepper spray

8     qualifies.

9          MS. LASKY:  Thank you, your Honor.

10          THE COURT:  But if the defendant uses pepper spray, he

11     will undoubtedly be guilty at the very least of the violation

12     of disorderly conduct, in which case he will have violated the

13     conditions of his supervision.

14          MS. LASKY:  Understood, your Honor.

15          THE COURT:  And we'll make sure probation understands

16     it too.

17          Finally, you will submit your person and any property,

18     residence, vehicle, papers, computer, other electronic

19     communication or data storage device, cloud storage or media

20     and your personal effects to a search by any United States

21     probation officer and, if needed, with the assistance of law

22     enforcement where there is reasonable suspicion that you have

23     violated a condition of your supervision or engaged in unlawful

24     conduct.

25          I just signed a three-year warrant for a search of

M46WsanS

1    you, your home, your devices, which are already being

2    monitored, and your personal effects, as long as your probation

3    officer has a reasonable suspicion that you're violating the

4    conditions of your release or engaging in unlawful behavior,

5    which, by the way, is a violation of the conditions of your

6    release.  Your failure to submit to search is grounds for

7    revocation of release.  You need to warn other people that you

8    live with or work with that the premises may be subject to

9    search pursuant to such a condition.  Any search must be

10   conducted at a reasonable time and in a reasonable manner.

11            In other words, Mr. Sanchez, someone is going to be

12   looking over your shoulder for the next three years, and that's

13   appropriate given what you did.

14            It is my recommendation that the defendant be

15   supervised in the district of residence, which is the Southern

16   District of New York.

17            I am not imposing a fine.  Mr. Sanchez has no ability

18   to pay a fine.

19            You are required to pay a $100 special assessment --

20   that's court costs -- not waivable, due and payable within 30

21   days.

22            Restitution and forfeiture are not applicable in this

23   case.

24            Was there a plea agreement?

25            MS. LASKY:  No, your Honor.  It was a *Pimentel*.

M46WsanS

1        THE COURT:  OK.

2        Malik Sanchez, you have a right to take an appeal from

3   the sentence that has been imposed upon you.

4        In addition, if the government believes that the

5   sentence I have imposed is unreasonable, it has the right to

6   take an appeal from the sentence.

7        In either event, if you wish to file an appeal from

8   the sentence imposed upon you or if the government decides to

9   file an appeal, you are entitled to be represented by counsel

10   and to have counsel appointed to represent you without charge

11   if you are unable to retain counsel.

12        Do you understand that?

13        THE DEFENDANT:  Yes, your Honor.

14        THE COURT:  Mr. Sanchez, I'm taking a chance on you.

15   It's the second time I've done that.  The first time it worked

16   out pretty well, but you had today hanging over you, so you had

17   motivation.  I need to make sure something's hanging over you

18   while you're on supervised release, so let me tell you what

19   happens to people who violate their supervised release in my

20   courtroom.

21        I have no tolerance, zero tolerance, for violations of

22   supervised release.  You go to jail.  What happened to the

23   fellow this morning, very likely that it will happen to you

24   unless you do everything your probation officer tells you to do

25   and you refrain from doing anything that your probation officer

M46WsanS

1    tells you not to do.  And don't think that I won't do it,

2    because I will be haunted by those two ladies' letters.

3              Do you understand what I'm saying to you, sir?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  OK.

6              Anything else from the government?

7              MS. LASKY:  No, your Honor.  Thank you.

8              THE COURT:  Thank you for the very helpful

9    presentation this morning.  I appreciate it.

10             Anything else, Mr. Kaminsky?

11             MR. KAMINSKY:  No, your Honor.  Thank you.

12             THE COURT:  Same to you.

13             I wish you the best of luck.  It looks to me like you

14   have a pretty substantial community of support, quite literally

15   behind you.  Don't let them down.  If you don't, I actually

16   predict, Mr. Sanchez, good things for you.  And I hope that

17   comes true.

18             These proceedings are closed.

19             (Adjourned)

20

21

22

23

24

25